In the
United States Court of Appeals
For the Seventh Circuit

No. 98-4107

Toys "R" Us, Inc.,

Petitioner-Appellant,

v.

Federal Trade Commission,

Respondent-Appellee.


On Petition for Review from a
Decision of the Federal Trade Commission.
Docket No. 9278.


Argued May 18, 1999--Decided August 1, 2000


  Before Coffey, Kanne, and Diane P. Wood,
Circuit Judges.

  Diane P. Wood, Circuit Judge.  The
antitrust laws, which aim to preserve and
protect competition in economically
sensible markets, have long drawn a sharp
distinction between contractual
restrictions that occur up and down a
distribution chain--so-called vertical
restraints--and restrictions that come
about as a result of agreements among
competitors, or horizontal restraints.
Sometimes, however, it can be hard as a
matter of fact to be sure what kind of
agreement is at issue. This was the
problem facing the Federal Trade
Commission ("the Commission") when it
brought under its antitrust microscope
the large toy retailer Toys "R" Us (more
properly Toys "R" Us, but to avoid debate
we will abbreviate the company's name as
TRU, in keeping with the parties' usage).

  The Commission concluded, upon an
extensive administrative record, that TRU
had acted as the coordinator of a
horizontal agreement among a number of
toy manufacturers. The agreements took
the form of a network of vertical
agreements between TRU and the individual
manufacturers, in each of which the

manufacturer promised to restrict the distribution of its products to low-priced warehouse club stores, on the condition that other manufacturers would do the same. This practice, the Commission found, violated sec. 5 of the Federal Trade Commission Act, 15 U.S.C. sec. 45. It also found that TRU had entered into a series of vertical agreements that flunked scrutiny under antitrust's rule of reason. TRU appealed that decision to us. It attacks both the sufficiency of the evidence supporting the Commission's conclusions and the scope of the Commission's remedial order. It is hard to prevail on either type of challenge: the former is fact-intensive and faces the hurdle of the substantial evidence standard of review, while the latter calls into question the Commission's exercise of its discretion to remedy an established violation of the law. We conclude that, while reasonable people could differ on the facts in this voluminous record, the Commission's decisions pass muster, and we therefore affirm.

I

TRU is a giant in the toy retailing industry. The Commission found that it sells approximately 20% of all the toys sold in the United States, and that in some metropolitan areas its share of toy sales ranges between 35% and 49%. The variety of toys it sells is staggering: over the course of a year, it offers about 11,000 individual toy items, far more than any of its competitors. As one might suspect from these figures alone, TRU is a critical outlet for toy manufacturers. It buys about 30% of the large, traditional toy companies' total output and it is usually their most important customer. According to evidence before the Commission's administrative law judge, or ALJ, even a company as large as Hasbro felt that it could not find other retailers to replace TRU--and Hasbro, along with Mattel, is one of the two largest toy manufacturers in the country, accounting for approximately 12% of the market for traditional toys and 10% of a market that includes video games. Similar opinions were offered by Mattel and smaller manufacturers.

Toys are sold in a number of different kinds of stores. At the high end are

traditional toy stores and department stores, both of which typically sell toys for 40 to 50% above their cost. Next are the specialized discount stores--a category virtually monopolized by TRU today--that sell at an average 30% mark-up. General discounters like Wal-Mart, K-Mart, and Target are next, with a 22% mark-up, and last are the stores that are the focus of this case, the warehouse clubs like Costco and Pace. The clubs sell toys at a slender mark-up of 9% or so.

The toys customers seek in all these stores are highly differentiated products. The little girl who wants Malibu Barbie is not likely to be satisfied with My First Barbie, and she certainly does not want Ken or Skipper. The boy who has his heart set on a figure of Anakin Skywalker will be disappointed if he receives Jar-Jar Binks, or a truck, or a baseball bat instead. Toy retailers naturally want to have available for their customers the season's hottest items, because toys are also a very faddish product, as those old enough to recall the mania over Cabbage Patch kids or Tickle Me Elmo dolls will attest.

What happened in this case, according to the Commission, was fairly simple. For a long time, TRU had enjoyed a strong position at the low price end for toy sales, because its only competition came from traditional toy stores who could not or did not wish to meet its prices, or from general discounters like Wal-Mart or K-Mart, which could not offer anything like the variety of items TRU had and whose prices were not too far off TRU's mark.

The advent of the warehouse clubs changed all that. They were a retail innovation of the late 1970s: the first one opened in 1976, and by 1992 there were some 600 individual club stores around the country. Rather than earning all of their money from their mark-up on products, the clubs sell only to their members, and they charge a modest annual membership fee, often about $30. As the word "warehouse" in the name suggests, the clubs emphasize price competition over service amenities. Nevertheless, the Commission found that the clubs seek to offer name-brand merchandise, including toys. During the late 1980s and early

1990s, warehouse clubs selected and purchased from the toy manufacturers' full array of products, just like everyone else. In some instances they bought specialized packs assembled for the "club" trade, but they normally preferred stocking conventional products so that their customers could readily compare the price of an item at the club against the price of the same item at a competing store.

To the extent this strategy was successful, however, TRU did not welcome it. By 1989, its senior executives were concerned that the clubs were a threat to TRU's low-price image and, more importantly, to its profits. A little legwork revealed that as of that year the clubs carried approximately 120-240 items in direct competition with TRU, priced as much as 25 to 30% below TRU's own price levels.

TRU put its President of Merchandising, a Mr. Goddu, to work to see what could be done. The response Goddu and other TRU executives formulated to beat back the challenge from the clubs began with TRU's decision to contact some of its suppliers, including toy manufacturing heavyweights Mattel, Hasbro, and Fisher Price. At the Toy Fair in 1992 (a major event at which the next Christmas season's orders are placed), Goddu informed the manufacturers of a new TRU policy, which was reflected in a memo of January 29, 1992. The policy set forth the following conditions and privileges for TRU:

The clubs could have no new or promoted product unless they carried the entire line.

All specials and exclusives to be sold to the clubs had to be shown first to TRU to see if TRU wanted the item.

Old and basic product had to be in special packs.

Clearance and closeout items were permissible provided that TRU was given the first opportunity to buy the product.

There would be no discussion about prices.

TRU was careful to meet individually with each of its suppliers to explain its new policy. Afterwards, it then asked each one what it intended to do. Negotiations between TRU and the manufacturers followed, as a result of which each manufacturer eventually agreed that it would sell to the clubs only highly-differentiated products (either uniqueindividual items or combo packs) that were not offered to anything but a club (and thus of course not to TRU). As the Commission put it, "[t]hrough its announced policy and the related agreements discussed below, TRU sought to eliminate the competitive threat the clubs posed by denying them merchandise, forcing the clubs' customers to buy products they did not want, and frustrating customers' ability to make direct price comparisons of club prices and TRU prices." FTC opinion at 14.

The agreements between TRU and the various manufacturers were, of course, vertical agreements, because they ran individually from the supplier/manufacturer to the purchaser/retailer. The Commission found that TRU reached about 10 of these agreements. After the agreements were concluded, TRU then supervised and enforced each toy company's compliance with its commitment.

But TRU was not content to stop with vertical agreements. Instead, the Commission found, it decided to go further. It worked for over a year and a half to put the vertical agreements in place, but "the biggest hindrance TRU had to overcome was the major toy companies' reluctance to give up a new, fast-growing, and profitable channel of distribution." FTC opinion at 28. The manufacturers were also concerned that any of their rivals who broke ranks and sold to the clubs might gain sales at their expense, given the widespread and increasing popularity of the club format. To address this problem, the Commission found, TRU orchestrated a horizontal agreement among its key suppliers to boycott the clubs. The evidence on which the Commission relied showed that, at a minimum, Mattel, Hasbro, Fisher Price, Tyco, Little Tikes, Today's Kids, and Tiger Electronics agreed to join in the boycott "on the condition that their competitors would do the same." FTC

opinion at 28 (emphasis added).

The Commission first noted that internal documents from the manufacturers revealed that they were trying to expand, not to restrict, the number of their major retail outlets and to reduce their dependence on TRU. They were specifically interested in cultivating a relationship with the warehouse clubs and increasing sales there. Thus, the sudden adoption of measures under which they decreased sales to the clubs ran against their independent economic self-interest. Second, the Commission cited evidence that the manufacturers were unwilling to limit sales to the clubs without assurances that their competitors would do likewise. FTC opinion at 29. Goddu himself testified that TRU communicated the message "I'll stop if they stop" from manufacturer to competing manufacturer. FTC opinion at 30. He specifically mentioned having such conversations with Mattel and Hasbro, and he said more generally "We communicated to our vendors that we were communicating with all our key suppliers, and we did that I believe at Toy Fair 1992. We made a point to tell each of the vendors that we spoke to that we would be talking to our other key suppliers." Id. at 31.

Evidence from the manufacturers corroborated Goddu's account. A Mattel executive said that it would not sell the clubs the same items it was selling to TRU, and that this decision was "based on the fact that competition would do the same." Id. at 32. A Hasbro executive said much the same thing: "because our competitors had agreed not to sell loaded [that is, promoted] product to the clubs, that we would . . . go along with this." Id. TRU went so far as to assure individual manufacturers that no one would be singled out.

Once the special warehouse club policy (or, in the Commission's more pejorative language, boycott) was underway, TRU served as the central clearinghouse for complaints about breaches in the agreement. The Commission gave numerous examples of this conduct in its opinion. See id. at 33-37.

Last, the Commission found that TRU's policies had bite. In the year before the boycott began, the clubs' share of all

toy sales in the United States grew from 1.5% in 1991 to 1.9% in 1992. After the boycott took hold, that percentage slipped back by 1995 to 1.4%. Local numbers were more impressive. Costco, for example, experienced overall growth on sales of all products during the period 1991 to 1993 of 25%. Its toy sales increased during same period by 51%. But, after the boycott took hold in 1993, its toy sales decreased by 1.6% even while its overall sales were still growing by 19.5%. The evidence indicated that this was because TRU had succeeded in cutting off its access to the popular toys it needed. In 1989, over 90% of the Mattel toys Costco and other clubs purchased were regular (i.e. easily comparable) items, but by 1993 that percentage was zero. Once again, the Commission's opinion is chock full of similar statistics.

The Commission also considered the question whether TRU might have been trying to protect itself against free riding, at least with respect to its vertical agreements. It acknowledged that TRU provided several services that might be important to consumers, including "advertising, carrying an inventory of goods early in the year, and supporting a full line of products." FTC opinion at 41-42. Nevertheless, it found that the manufacturers compensated TRU directly for advertising toys, storing toys made early in the year, and stocking a broad line of each manufacturer's toys under one roof. A 1993 TRU memorandum confirms that advertising is manufacturer-funded and is "essentially free." FTC opinion at 42. In 1994, TRU's net cost of advertising was a tiny 0.02% of sales, or $750,000, out of a total of $199 million it spent on advertising that year. As the Commission saw it, "[a]dvertising . . . was a service the toy manufacturers provided for TRU and not the other way around." Id. (emphasis in original). TRU records also showed that manufacturers routinely paid TRU credits for warehousing services, and that they compensated it for full line stocking. In short, the Commission found, there was no evidence that club competition without comparable services threatened to drive TRU services out of the market or to harm customers. Manufacturers paid each retailer directly for the services they wanted the retailer to furnish.

Based on this record, the Commission drew three central conclusions of law: (1) the TRU-led manufacturer boycott of the warehouse clubs was illegal per se under the rule enunciated in Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284 (1985); (2) the boycott was illegal under a full rule of reason analysis because its anticompetitive effects "clearly outweigh[ed] any possible business justification"; and (3) the vertical agreements between TRU and the individual toy manufacturers, "entered into seriatim with clear anticompetitive effect, violate section 1 of the Sherman Act." FTC opinion at 46. These antitrust violations in turn were enough to prove a violation of FTC Act sec. 5, which for present purposes tracks the prohibitions of the Sherman and Clayton Acts. After offering a detailed explanation of these conclusions (spanning 42 pages in its slip opinion), it turned to the question of remedy and affirmed the order the ALJ had entered.

In the Commission's words, its order:

. . . prohibits TRU from continuing, entering into, or attempting to enter into, vertical agreements with its suppliers to limit the supply of, or refuse to sell, toys to a toy discounter. See para. II.A. The order also prohibits TRU from facilitating, or attempting to facilitate, an agreement between or among its suppliers relating to the sale of toys to any retailer. See para. II.D. Additionally, TRU is enjoined from requesting information from suppliers about their sales to any toy discounter, and from urging or coercing suppliers to restrict sales to any toy discounter. See para.para. II.B, C. These four elements of relief are narrowly tailored to stop, and prevent the repetition of, TRU's illegal conduct.

FTC opinion at 88. TRU complained that the order trampled on its ability to exercise its rights under United States v. Colgate & Co., 250 U.S. 300 (1919), to choose unilaterally the companies with which it wanted to deal. The Commission rejected the point, because it found that TRU had repeatedly crossed the line from unilateral to concerted behavior in illegal ways, and that it was entitled to

include remedial provisions that were necessary to prevent recurrence of the illegal behavior, citing FTC v. National Lead Co., 352 U.S. 419, 430 (1957).

Commissioner Swindle concurred in part and dissented in part. He agreed with the majority's determination that TRU had engaged in a series of anticompetitive vertical agreements, and he thus agreed with the remedial provisions designed to proscribe those practices and their effects. He was unconvinced, however, that TRU had orchestrated a horizontal combination as well, believing that the evidence was too thin to support that conclusion. TRU appealed from the Commission's final order of October 13, 1998, to this court, under 15 U.S.C. sec. 45(c), as it carries on business in this circuit (as well as every other circuit, to the best of our knowledge).

II

On appeal, TRU makes four principal arguments: (1) the Commission's finding of a horizontal conspiracy is contrary to the facts and impermissibly confuses the law of vertical restraints with the law of horizontal restraints; (2) whether the restrictions were vertical or horizontal, they were not unlawful because TRU has no market power, and thus the conduct can have no significant anticompetitive effect; (3) the TRU policy was a legitimate response to free riding; and (4) the relief ordered by the Commission goes too far. We review the Commission's legal conclusions de novo, but we must accept its findings of fact if they are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 454 (1986).

A.  Horizontal Conspiracy

As TRU correctly points out, the critical question here is whether substantial evidence supported the Commission's finding that there was a horizontal agreement among the toy manufacturers, with TRU in the center as the ringmaster, to boycott the warehouse clubs. It acknowledges that such an agreement may be proved by either direct or circumstantial evidence, under cases

such as Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) (horizontal agreements), Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984) (vertical agreements), and Interstate Circuit, Inc. v. United States, 306 U.S. 208 (1939). When circumstantial evidence is used, there must be some evidence that "tends to exclude the possibility" that the alleged conspirators acted independently. Monsanto, 465 U.S. at 764, quoted in Matsushita, 475 U.S. at 588. This does not mean, however, that the Commission had to exclude all possibility that the manufacturers acted independently. As we pointed out in In re Brand Name Prescription Drugs Antitrust Litigation, 186 F.3d 781 (7th Cir. 1999), that would amount to an absurd and legally unfounded burden to prove with 100% certainty that an antitrust violation occurred. Id. at 787. The test states only that there must be some evidence which, if believed, would support a finding of concerted behavior. In the context of an appeal from the Commission, the question is whether substantial evidence supports its conclusion that it is more likely than not that the manufacturers acted collusively.

In TRU's opinion, this record shows nothing more than a series of separate, similar vertical agreements between itself and various toy manufacturers. It believes that each manufacturer in its independent self-interest had an incentive to limit sales to the clubs, because TRU's policy provided strong unilateral incentives for the manufacturer to reduce its sales to the clubs. Why gain a few sales at the clubs, it asks, when it would have much more to gain by maintaining a good relationship with the 100-pound gorilla of the industry, TRU, and make far more sales?

We do not disagree that there was some evidence in the record that would bear TRU's interpretation. But that is not the standard we apply when we review decisions of the Federal Trade Commission. Instead, we apply the substantial evidence test, which we described as follows in another case in which the Commission's decision to stop a hospital merger was at issue:

Our only function is to determine whether

the Commission's analysis of the probable effects of these acquisitions on hospital competition in Chattanooga is so implausible, so feebly supported by the record, that it flunks even the deferential test of substantial evidence.

Hospital Corp. of America v. F.T.C., 807 F.2d 1381, 1385 (7th Cir. 1986). There, as here, the Commission painstakingly explained in a long opinion exactly what evidence in the record supported its conclusion. We need only decide whether the inference the Commission drew of horizontal agreement was a permissible one from that evidence, not if it was the only possible one.

The Commission's theory, stripped to its essentials, is that this case is a modern equivalent of the old Interstate Circuit decision. That case too involved actors at two levels of the distribution chain, distributors of motion pictures and exhibitors. Interstate Circuit was one of the exhibitors; it had a stranglehold on the exhibition of movies in a number of Texas cities. The antitrust violation occurred when Interstate's manager, O'Donnell, sent an identical letter to the eight branch managers of the distributor companies, with each letter naming all eight as addressees, in which he asked them to comply with two demands: a minimum price for first-run theaters, and a policy against double features at night. The trial court there drew an inference of agreement from the nature of the proposals, from the manner in which they were made, from the substantial unanimity of action taken, and from the lack of evidence of a benign motive; the Supreme Court affirmed. The new policies represented a radical shift from the industry's prior business practices, and the Court rejected as beyond the range of probability that such unanimity of action was explainable only by chance.

The Commission is right. Indeed, as it argues in its brief, the TRU case if anything presents a more compelling case for inferring horizontal agreement than did Interstate Circuit, because not only was the manufacturers' decision to stop dealing with the warehouse clubs an abrupt shift from the past, and not only is it suspicious for a manufacturer to deprive itself of a profitable sales outlet, but the record here included the direct evidence of communications that

was missing in Interstate Circuit. Just as in Interstate Circuit, TRU tries to avoid this result by hypothesizing independent motives. 306 U.S. at 223-24. If there were no evidence in the record tending to support concerted behavior, then we agree that Matsushita would require a ruling in TRU's favor. But there is. The evidence showed that the companies wanted to diversify from TRU, not to become more dependent upon it; it showed that each manufacturer was afraid to curb its sales to the warehouse clubs alone, because it was afraid its rivals would cheat and gain a special advantage in that popular new market niche. The Commission was not required to disbelieve the testimony of the different toy company executives and TRU itself to the effect that the only condition on which each toy manufacturer would agree to TRU's demands was if it could be sure its competitors were doing the same thing.

That is a horizontal agreement. As we explain further below in discussing TRU's free rider argument, it has nothing to do with enhancing efficiencies of distribution from the manufacturer's point of view. The typical story of a legitimate vertical transaction would have the manufacturer going to TRU and asking it to be the exclusive carrier of the manufacturer's goods; in exchange for that exclusivity, the manufacturer would hope to receive more effective promotion of its goods, and TRU would have a large enough profit margin to do the job well. But not all manufacturers think that exclusive dealing arrangements will maximize their profits. Some think, and are entitled to think, that using the greatest number of retailers possible is a better strategy. These manufacturers were in effect being asked by TRU to reduce their output (especially of the popular toys), and as is classically true in such cartels, they were willing to do so only if TRU could protect them against cheaters.

Northwest Stationers also demonstrates why the facts the Commission found support its conclusion that the essence of the agreement network TRU supervised was horizontal. There the Court described the cases that had condemned boycotts as "per se" illegal as those involving "joint efforts by a firm or firms to disadvantage competitors by either

directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." 472 U.S. at 294 (internal citations omitted). The boycotters had to have some market power, though the Court did not suggest that the level had to be as high as it would require in a case under Sherman Act sec. 2. Here, TRU was trying to disadvantage the warehouse clubs, its competitors, by coercing suppliers to deny the clubs the products they needed. It accomplished this goal by inducing the suppliers to collude, rather than to compete independently for shelf space in the different toy retail stores. See also NYNEX Corp. v. Discon, Inc., 525 U.S. 128 (1998); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207 (1959).

B.  Degree of TRU's Market Power

TRU's efforts to deflate the Commission's finding of market power are pertinent only if we had agreed with its argument that the Commission's finding of a horizontal agreement was without support. Horizontal agreements among competitors, including group boycotts, remain illegal per se in the sense the Court used the term in Northwest Stationers. We have found that this case satisfies the criteria the Court used in Northwest Stationers for condemnation without an extensive inquiry into market power and economic pros and cons: (1) the boycotting firm has cut off access to a supply, facility or market necessary for the boycotted firm (i.e. the clubs) to compete; (2) the boycotting firm possesses a "dominant" position in the market (where "dominant" is an undefined term, but plainly chosen to stand for something different from antitrust's term of art "monopoly"); and (3) the boycott, as we explain further below, cannot be justified by plausible arguments that it was designed to enhance overall efficiency. 472 U.S. at 294. We address the market power point here, therefore, only in the alternative.

TRU seems to think that anticompetitive effects in a market cannot be shown unless the plaintiff, or here the Commission, first proves that it has a large market share. This, however, has things backwards. As we have explained

elsewhere, the share a firm has in a properly defined relevant market is only a way of estimating market power, which is the ultimate consideration. Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, 784 F.2d 1325, 1336 (7th Cir. 1986). The Supreme Court has made it clear that there are two ways of proving market power. One is through direct evidence of anticompetitive effects. See FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61 (1986) ("the finding of actual, sustained adverse effects on competition in those areas where IFD dentists predominated, viewed in light of the reality that markets for dental services tend to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis."). The other, more conventional way, is by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case. See, e.g., United States v. E.I. duPont de Nemours & Co., 351 U.S. 377 (1956); United States v. Grinnell Corp., 384 U.S. 563 (1966); United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945) (suggesting that more than 90% is enough to constitute a monopoly for purposes of Sherman Act sec. 2 and 33% is not); Jefferson Parish Hospital Dist. No. 2 v. Hyde, 466 U.S. 2 (1984) (indicating that something more than 30% would be needed to show the kind of power over a tying product necessary for a violation of Sherman Act sec. 1).

The Commission found here that, however TRU's market power as a toy retailer was measured, it was clear that its boycott was having an effect in the market. It was remarkably successful in causing the 10 major toy manufacturers to reduce output of toys to the warehouse clubs, and that reduction in output protected TRU from having to lower its prices to meet the clubs' price levels. Price competition from conventional discounters like Wal-Mart and K-Mart, in contrast, imposed no such constraint on it, or so the Commission found. In addition, the Commission showed that the affected manufacturers accounted for some 40% of the traditional toy market, and that TRU had 20% of the national wholesale market and up to 49% of some local wholesale

markets. Taking steps to prevent a price collapse through coordination of action among competitors has been illegal at least since United States v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940). Proof that this is what TRU was doing is sufficient proof of actual anticompetitive effects that no more elaborate market analysis was necessary.

C.  Free Riding Explanation

TRU next urges that its policy was a legitimate business response to combat free riding by the warehouse clubs. We think, however, that it has fundamentally misunderstood the theory of free riding. Briefly, that theory is as follows. The manufacturer of a product, say widgets, has an incentive to distribute as many widgets as it can, while keeping its costs of distribution down as low as possible. In many instances, this means that the manufacturer will want to sell its widgets for a particular wholesale price and it will want its retailer to apply as low a mark-up as possible (i.e. put the product on the market for as little extra expense as possible). Sometimes, however, the manufacturer will want the retailer to provide special services or amenities that cost money, such as attractive premises, trained salespeople, long business hours, full-line stocking, or fast warranty service. But the costs of providing some of those amenities (usually pre-sale services) are hard to pass on to customers unless some form of restricted distribution is available. What the manufacturer does not want is for the shopper to visit the attractive store with highly paid, intelligent sales help, learn all about the product, and then go home and order it from a discount warehouse or (today) on-line discounters. The shopper in that situation has taken a "free ride" on the retailer's efforts; the retailer never gets paid for them, and eventually it stops offering the services. If those services were genuinely useful, in the sense that the product plus service package resulted in greater sales for the manufacturer than the product alone would have enjoyed, there is a loss both for the manufacturer and the consumer. Hence, antitrust law permits nonprice vertical restraints that are designed to facilitate the provision of extra

services, recognizing that a manufacturer in a competitive market who has guessed wrong will eventually be forced by the market to abandon the restrictions. See Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 724 (1988), quoting Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 52 n.19 (1977).

Here, the evidence shows that the free-riding story is inverted. The manufacturers wanted a business strategy under which they distributed their toys to as many different kinds of outlets as would accept them: exclusive toy shops, TRU, discount department stores, and warehouse clubs. Rightly or wrongly, this was the distribution strategy that each one believed would maximize its individual output and profits. The manufacturers did not think that the alleged "extra services" TRU might have been providing were necessary. This is crucial, because the most important insight behind the free rider concept is the fact that, with respect to the cost of distribution services, the interests of the manufacturer and the consumer are aligned, and are basically adverse to the interests of the retailer (who would presumably like to charge as much as possible for its part in the process). See Premier Electrical Construction Co. v. Nat'l Electrical Contractors Ass'n, 814 F.2d 358, 369-70 (7th Cir. 1987) ("[the rationale for permitting restricted distribution policies] depends on the alignment of interests between consumers and manufacturers. Destroy that alignment and you destroy the power of the argument.").

What TRU wanted or did not want is neither here nor there for purposes of the free rider argument. Its economic interest was in maximizing its own profits, not in keeping down its suppliers' cost of doing business. Furthermore, we note that the Commission made a plausible argument for the proposition that there was little or no opportunity to "free" ride on anything here in any event. The consumer is not taking a free ride if the cost of the service can be captured in the price of the item. As our earlier review of the facts demonstrated, the manufacturers were paying for the services TRU furnished, such as advertising, full-line

product stocking, and extensive inventories. These expenses, we may assume, were folded into the price of the goods the manufacturers charged to TRU, and thus these services were not susceptible to free riding. On this record, in short, TRU cannot prevail on the basis that its practices were designed to combat free riding.

D. Remedy

Last, we consider TRU's challenge to the remedial provisions the Commission ordered. TRU's basic point here is that the Commission has commanded it to do things that it would have been free to refuse, and conversely to refrain from actions it would have been free to take, in the absence of its violation of FTC Act sec. 5. So that its arguments can be fully understood, we set forth Section II of the decree in its entirety here:

IT IS ORDERED that respondent, directly or indirectly, through any corporation, subsidiary, division or other device, in connection with the actual or potential purchase or distribution of toys and related products, in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, forthwith cease and desist from:

A. Continuing, maintaining, entering into, and attempting to enter into any agreement or understanding with any supplier to limit supply or to refuse to sell toys and related products to any toy discounter.

B. Urging, inducing, coercing, or pressuring, or attempting to urge, induce, coerce, or pressure, any supplier to limit supply or to refuse to sell toys and related products to any toy discounter.

C. Requiring, soliciting, requesting or encouraging any supplier to furnish information to respondent relating to any supplier's sales or actual or intended shipments to any toy discounter.

D. Facilitating or attempting to facilitate agreements or understandings between or among suppliers relating to limiting the sale of toys and related products to any retailer(s) by, among other things, transmitting or conveying

complaints, intentions, plans, actions, or other similar information from one supplier to another supplier relating to sales to such retailer(s).

E. For a period of five years, (1) announcing or communicating that respondent will or may discontinue purchasing or refuse to purchase toys and related products from any supplier because that supplier intends to sell or sells toys and related products to any toy discounter, or (2) refusing to purchase toys and related products from a supplier because, in whole or in part, that supplier offered to sell or sold toys and related products to any toy discounter.

PROVIDED, however, that nothing in this order shall prevent respondent from seeking or entering into exclusive arrangements with suppliers with respect to particular toys.

TRU makes a perfunctory, one-paragraph argument that paragraphs II(B), II(C), II(D), and II(E)(1) impose a "gag order" that contravenes the Supreme Court's recognition in Monsanto Co. v. Spray-Rite Corp., supra, that manufacturers and distributors have a legitimate need for a free flow of information between them. This order, they claim, will create an irrational dislocation in the market to the detriment of toy suppliers, retailers, and consumers. With respect to paragraph II(E)(2), it argues that the five-year restriction on refusals to deal impermissibly cabins its Colgate rights to choose the suppliers with which it wants to deal. In effect, it claims, the decree will force it to purchase all toys that are offered to anyone, unless it can somehow prove that its refusal was because of a safety defect or other similar flaw.

We consider first TRU's challenges to parts II(B) through II(D) of the order. (It has not mentioned II(A) in its brief, and thus it has waived any challenge to that part of the order.) In general, if a retailer had some kind of restricted distribution arrangement with a manufacturer, Monsanto holds that it is permissible for the retailer to urge the manufacturer to respect the limits of that agreement. The retailer may communicate complaints about the

provision of product to discounters, if that runs afoul of the promises in the distribution agreement. Colgate indicates that the retailer would also be within its rights to tell the manufacturer that it will no longer stock the manufacturer's product, if it is unhappy with the company it is keeping (i.e. if the manufacturer is sending too many goods to discounters, stores with a reputation for rude and sloppy service, or other undesirables).

Two facts distinguish these general rules from the situation in which TRU finds itself. First, unilateral actions of the sort protected by Monsanto and Colgate are not the same thing as a retailer's request to the manufacturer to change the latter's business practice. Under paragraph II(B) of the decree, TRU must not tell the manufacturer what to do; it is still permitted to decide which toys it wants to carry and which ones to drop, based on business considerations such as the expected popularity of the item. Second, to the extent paragraph II(B) might indirectly inhibit TRU from exercising its unilateral judgment, TRU must confront the fact that the FTC is not limited to restating the law in its remedial orders. Such orders can restrict the options for a company that has violated sec. 5, to ensure that the violation will cease and competition will be restored. See National Lead Co., supra, 352 U.S. at 430; FTC v. Cement Institute, 333 U.S. 683, 726-27 (1948); Corning Glass Works v. FTC, 509 F.2d 293, 303 (7th Cir. 1975). See also FTC v. Colgate-Palmolive Co., 380 U.S. 374, 392 (1965) (making the same point, in context of the Commission's deceptive practices authority).

The second point also applies to TRU's objections to paragraphs II(C) and II(D). In addition, we note that the retailer should not have any reason to obtain its suppliers' business records about shipments to the retailer's competitors. That is the supplier's concern. TRU is protected as long as it can ensure that it receives what was promised to it. Also, of course, the decree preserves TRU's right to enter into exclusive arrangements with respect to particular toys. In so doing, it also implicitly allows TRU to engage in communications that are necessary for the implementation

and enforcement of such agreements. Paragraph II(D) directly addresses the Commission's finding of a horizontal agreement, and it orders TRU not to go out and create a new one. The Commission was certainly acting within the bounds of its discretion when it included these provisions.

Paragraph II(E) appears to be the one that causes the greatest concern to TRU. This strikes us as a closer call, but in this connection the standard of review becomes important. The Commission has represented in its brief to this court that the decree "leaves [TRU] free to make stocking decisions based on a wide range of business reasons; it must simply make those decisions--for a period of five years--independent of whether clubs or other discounters are carrying the same item." FTC Brief at 58. The attempt to use its market clout to harm the warehouse clubs lies at the heart of this case, and so it is easy to see why the Commission chose to prohibit reliance on the supplier's practices vis e vis the clubs as a reason for TRU's own purchasing decisions. At bottom, TRU is really just worried that it will be difficult to prove that any particular purchasing decision was free from the prohibited taint. It will be easy to refrain from announcements or communications about refusals to deal, which is what II(E)(1) prohibits. With respect to II(E)(2), if TRU implements adequate internal procedural safeguards, it should be possible to demonstrate that its buying decisions were not influenced by anything the manufacturers were doing with discounters like the clubs. These refusals to deal were the means TRU used to accomplish the unlawful result, and as such, they are subject to regulation by the Commission. See National Lead, 352 U.S. at 425. Under the abuse of discretion standard that governs our review of the Commission's choice of remedy, see Siegel Co. v. FTC, 327 U.S. 608, 612-13 (1946), this does not appear to be a remedy that "has no reasonable relation to the unlawful practices found to exist." We therefore have no warrant to set it aside. If, however, it becomes clear in practice that this provision is unworkable, TRU is free to return to the Commission to petition for a modification of the order.

III

We conclude that the Commission's decision is supported by substantial evidence on the record, and that its remedial decree falls within the broad discretion it has been granted under the FTC Act. The decision is hereby Affirmed.