In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-1992

MILES DISTRIBUTORS, INC.,

*Plaintiff-Appellant,*

*v.*

SPECIALTY CONSTRUCTION BRANDS, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:04-CV-561—**Christopher A. Nuechterlein**, *Magistrate Judge.*

---

ARGUED DECEMBER 8, 2006—DECIDED FEBRUARY 6, 2007

---

Before BAUER, FLAUM, and KANNE, *Circuit Judges.*

FLAUM, *Circuit Judge.* After Specialty Construction Brands, Inc. (hereinafter "TEC")[1], a manufacturer of tile installation products, stopped supplying wholesale materials to Miles Distributors, Inc. ("Miles"), Miles filed suit against TEC, alleging restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1, and a state law claim for interference with prospective business advantage. On February 27, 2006, the district court granted summary

---

[1] Specialty Construction Brands supplies its distributors with tile installation products bearing the brand name "TEC."

judgment in favor of TEC on all claims, and Miles appealed. For the following reasons, we affirm the district court's ruling.

## I. BACKGROUND

TEC manufactures industrial and residential building products, including a line of tile installation products, i.e., grout and mortar.[2] Miles sells numerous brands of tile and, until 2004, carried TEC's tile installation products. Michael Miles incorporated the company in 1969, and his son Doug is the company's current president. Although Miles was originally centered in northern Indiana, its business expanded in 2001, putting it in competition with a number of other TEC distributors, including Virginia Tile, Louisville Tile, Sobol Sales, Millers Wholesale, and American Equipment. During the relevant time period, two of Miles's competitors expanded their businesses as well. Both Millers Wholesale and Virginia Tile began selling TEC products in South Bend, Indiana, where Miles is headquartered.

Historically, Miles paid more for TEC products than some of its competitors, due to a regional pricing system. In March 2003, however, a significant change occurred when TEC implemented a new national pricing program that gave all of its distributors an equal opportunity to receive lower prices if they purchased TEC product in bulk. As a result, Miles began paying the same price for TEC materials as Virginia Tile and Louisville Tile. Although Miles began paying less for TEC materials, it did not raise its price margins, i.e., its markup for resale,

---

[2] Mortar is a strong adhesive in which a tile is set; grout is used to fill in the spaces between tiles.

which varied based on the volume purchased.[3] As a result of TEC's new pricing, Miles's prices decreased and were lower than those offered by other TEC distributors.

As TEC distributors expanded and prices changed, TEC began to receive complaints from other distributors about Miles's pricing. As early as April 2002, Louisville Tile's President, Randy Parker, complained to TEC that Miles's margins were lower than those charged by Louisville Tile. In September 2002, a Louisville Tile representative complained to TEC that Miles's margin on a particular TEC product was 22% while Louisville's price margin was 30%. At some point, Parker remarked to Doug Miles, "Hey Doug, let's keep our margins up on TEC down here."

During a March 2003 trade show, TEC's Nationwide Sales Manager, Christopher Bailey, informed Doug Miles that TEC was dissatisfied with Miles's pricing. Although Bailey characterized the discussion as one about market tactics rather than price, he conceded that "the gist of [the meeting] was do you have a new price list or what are you doing out there with our product or you're causing me headaches." According to Miles's Sales and Marketing Manager, John Zolman, Bailey was more blunt during the trade show conversation, warning Zolman and Doug Miles that Miles's pricing structure would cause problems in Indianapolis, that Miles's prices were too low, and that Louisville Tile was already complaining about Miles's pricing. Later, at a September 2003 meeting, Bailey again expressed concerns about Miles's pricing and asked Doug Miles to consider raising prices in the field. Doug Miles and Zolman said they would look into the

---

[3] Miles's markups were as follows: pallet pricing (the largest volume) was 18.5%, wholesale volume was 27%, and wholesale was 45%. Miles introduced pallet pricing in 2003.

possibility of changing their prices, but ultimately declined to do so.

On April 23, 2003, Bailey sent Virginia Tile's General Sales Manager, Jack Mulder, an email message in which he wrote, in part: "it has come to my attention that there may be some lingering concerns or pricing issues with TEC," and that "my ultimate fear is that we are unaware of these issues and don't get a chance to address and/or alleviate them before a radical decision gets made by Virginia Tile." Bailey further stated, "We do not want to see a 2nd line get brought into Virginia Tile[,] and we will do all in our power to make this unnecessary." Mulder responded by email the next day expressing concerns that Miles's price list could force Virginia Tile to lower its prices. Mulder continued, "let's decide to make a committed effort to responding by ensuring and protecting OURS and YOUR market share currently held together."

On July 8, 2003, Randy Parker emailed Jack Mulder writing, "Miles continues to 'poach' work from us in area. It is very important to all that our two companies take the high road and work together."

After receiving more complaints from TEC's other distributors, Bailey considered terminating TEC's relationship with Miles. At a January 2004 trade show, Bailey approached Parker and said, "Randy, very hypothetically, if we were to [terminate our relationship with Miles], and I'm not saying we're going to, I'm saying if we were to do, what would you do in order to make up that massive loss of [sales] volume?" Parker indicated he would think about it.

In February 2004, TEC's management discussed terminating Miles at its quarterly meeting and decided to begin studying the issue so that TEC could revisit it at the next quarterly meeting. Bailey instructed two TEC Strategic Area Managers, Marc Mularoni and Charlie Renner, to

research the effects of termination on their respective territories. Mularoni approached Louisville Tile and American Equipment to ask whether and how they would make up the lost sales volume if TEC terminated Miles. Louisville Tile responded that it would re-emphasize the TEC product line to compete against other brands, and it would work with Mularoni to sell to existing TEC accounts (Miles's customers), as well as new accounts. American Equipment also told TEC that it would help recapture the market.

Meanwhile, Renner sought similar feedback from TEC distributors in his territory. By April 13, 2004, Renner had been in discussions with Virginia Tile and Millers Wholesale about the aftermath of terminating Miles. A few days later, Virginia Tile agreed to aggressively pursue the South Bend market and to develop a game plan for Fort Wayne. In an April 19 email exchange, Mularoni told Renner that "Louisville Indy will be taking TEC to Fort Wayne . . . [and will] do a blitz with TEC when our decision is implemented."

During the course of its discussions with TEC, Louisville Tile also agreed that it would begin selling TEC products in its Chattanooga store, where it had previously sold only a competing brand.[4] Similarly, Virginia Tile agreed to increase its stock of TEC products in its Cleveland store. Renner testified that this increase in TEC stock was "something we hoped to gain from the decision [to terminate Miles]."

After consulting with the competing distributors, Renner and Mularoni decided to terminate Miles. According to their proposed post-termination plan, key distributors

---

[4] Louisville Tile agreed to replace 50% of its volume at the Chattanooga store with TEC products within nine months.

would get a "heads up" so they could "be up and rolling" before Miles learned of its termination. TEC would notify Miles on a Friday at 10:00 A.M., and, while Miles was being notified, Miles's competitors would send emails and faxes to Miles's customers. TEC also used a promotional giveaway to provide Miles's customers with an additional incentive to continue buying TEC products.

Mularoni communicated the final decision to Louisville Tile and American Equipment, and Renner informed Virginia Tile. Just before TEC informed Miles of its decision, Virginia Tile sent the following memorandum to its sales team:

> This morning (Friday June 11) TEC is notifying MILES DISTRIBUTING of South Bend they will no longer be a TEC Distributor. This is a culmination of two things: 1) many discussions that VIRGINIA TILE COMPANY and Miller Wholesale has had with TEC Mgmt and 2) TEC's consideration for the manner of marketing that MILES Distributing uses and the compatibility to their long range goals. . . .

> We need to relate our knowledge of this event in a very CONSISTENT manner. If a Customer inquires to the reasoning behind this, our response is to be: THIS IS A RESULT OF A TEC DECISION! Whether on the record OR OFF THE RECORD, do NOT imply that it was a result of any discussions we have had or any dissatisfaction we expressed over the manner in which they marketed the line.

> TEC is counting on VIRGINIA TILE COMPANY to pick up this additional business as it goes "back on the street" with some extra effort. We are counting on you to find this business and bring it to VIRGINIA TILE COMPANY. If you have any questions please call me immediately.

On June 18, 2004, TEC terminated Miles. A letter, dated June 17, 2004 and addressed to Doug Miles, stated in pertinent part:

> We have decided to consolidate our distribution channels in the Midwest, and have made the difficult decision to cease our direct sales to your company. After August 18, 2004[,] we can no longer accept purchase orders for shipment to your facilities. This notice allows for a two month transition period.

Shortly before the letter arrived, Bailey called Michael Miles to inform him of the termination, telling him that TEC was consolidating its distribution in the Midwest and that TEC had to end its relationship with Miles. Michael Miles was shocked by the news. Despite Bailey's proffered reason for terminating Miles, TEC closed no other distributors in the Midwest in 2004. In fact, Mularoni's March 2004 quarterly report suggested that TEC "look to expand distribution in markets where there are multiple existing TEC customers."

In a May 26, 2004 document entitled "Miles Termination Plan," TEC laid out "talking points" concerning reasons for the termination under a heading that said, "Miles not on premium strategy." The talking points included: (1) currently stocking three competing manufacturers in all markets; and (2) weak promotional strategy. The document did not mention pricing or consolidation of distribution channels.

Until TEC terminated Miles, it did not complain about the manner in which Miles supported the product or express concerns that Miles was "free-riding" the brand recognition and good-will generated by other TEC distribu-

tors.[5] Further, Miles emphasizes that it was not the only TEC distributor that stocked competing brands; Louisville Tile, American Equipment, and Virginia Tile all stocked competing brands at some of their stores. Miles also notes that its TEC product sales vastly exceeded sales of its other two tile installation brands.

Suspicious of the circumstances surrounding its termination, Miles filed suit against TEC on August 27, 2004, alleging antitrust violations. On May 19, 2005 Miles amended its complaint, adding a state law claim. On October 3, 2005, TEC moved for summary judgment, which the district court granted on February 27, 2006. This appeal followed.

## II. DISCUSSION

Section one of the Sherman Act forbids contracts, combinations, and conspiracies that unreasonably restrain trade. *See* 15 U.S.C. § 1; *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002). Although courts generally analyze claims alleging restraint of trade under a rule of reason, certain kinds of agreements will so often prove harmful to competition and so rarely prove justified that plaintiffs need not prove that the agreements are, in fact, anticompetitive. *See State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997); *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289-290 (1985). Such agreements are unlawful per se.

---

[5] According to Miles, its promotional strategies included training its sales people and its customers on the use of TEC product, promoting TEC through advertisements and brochures, and supporting TEC products in all of its locations. Miles representatives also accompanied TEC representatives on visits to customers and introduced customers to new TEC products.

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998). Relying on the Sherman Act as well as a derivative state law claim, Miles argues that its termination as a TEC distributor was anticompetitive per se and that genuine issues of fact precluded the entry of summary judgment.

## A.  Summary Judgment Standard

We review the district court's grant of summary judgment in favor of TEC de novo. *Gordon v. United Airlines*, 246 F.3d 878, 885 (7th Cir. 2001). In considering Miles's appeal, we draw our own conclusions of law and fact from the record, making all reasonable inferences in favor of Miles, and will uphold summary judgment in TEC's favor only if there is no genuine issue of material fact and TEC is entitled to judgment as a matter of law. *Id. See also* Fed. R. Civ. P. 56(c).

## B.  Classification of Alleged Conspiracy

When an agreement between competitors at the same level of distribution restrains trade, it has traditionally been denominated horizontal. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988). Trade restraining agreements between firms at different levels of distribution, e.g., a wholesale supplier and a retail distributor, are deemed vertical restraints. *Id.* In this case, the district court did not classify the alleged conspiracy as either horizontal or vertical, reasoning that such a classification was immaterial to the outcome. Specifically, the court stated:

> A review of the cases suggests that whether one classifies the agreement as horizontal or vertical is not of consequence in this case because plaintiff must still prove an agreement to fix the price or price levels

> after termination. Therefore, the appropriate analysis is not whether this agreement is vertical or horizontal, but rather whether the plaintiff has provided sufficient evidence of an agreement to fix price or price levels to withstand a motion for summary judgment.

*Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.*, 417 F. Supp. 2d 1030, 1036 (N.D. Ind. 2006). In fact, the classification of the alleged conspiracy is of consequence, because it determines what evidence Miles must produce in order to survive summary judgment. To prove a vertical conspiracy that is per se illegal, Miles must show an agreement to fix prices. *See Bus. Elecs.*, 485 U.S. at 735-36. However, certain horizontal conspiracies, like horizontal group boycotts,[6] are illegal regardless of price fixing. *See NYNEX Corp.*, 525 U.S. at 134. If, as Miles has suggested, its competitor tile stores conspired together to force TEC to terminate Miles, then the conspiracy constitutes an antitrust violation.[7] *See, e.g.*, *Klor's, Inc. v.*

---

[6]  Horizontal restraints that are per se illegal usually involve boycotts by a group of competitors against a joint supplier in order to disadvantage another competitor.

[7]  The characterization of the offense as a horizontal conspiracy, given that it is a lawsuit between a supplier and a distributor, might strike some as odd. Although the sole defendant in this case is a supplier, the alleged boycott also includes retailers, i.e., conspirators at different levels of distribution. Miles notes that a facially vertical restraint imposed by a manufacturer can be horizontal if caused by a "horizontal cartel" among distributors, citing *Business Electronics*, 485 U.S. at 730, n. 4 ("A restraint is horizontal not because it has horizontal effects, but because it is a product of a horizontal agreement."). Though the idea that an apparent vertical restraint may in fact be horizontal comes from dicta that the Supreme Court relegated to a footnote, at least one circuit has followed that dicta. *See Rossi v. Standard*

(continued...)

*Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959) (noting that horizontal group boycotts have long been forbidden). We therefore consider whether Miles has shown that a genuine issue of material fact remains under either a horizontal or vertical conspiracy analysis.

## C. Horizontal Conspiracy

A plaintiff may prove a horizontal conspiracy by either direct or circumstantial evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 934 (7th Cir. 2000). When a plaintiff attempts to defeat summary judgment by highlighting circumstantial evidence of a conspiracy, some of the evidence must tend to exclude the possibility that the alleged conspirators acted independently rather than in concert. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *Toys "R" Us*, 221 F.3d at 934 . Miles argues that it submitted sufficient evidence of concerted action among competing TEC distributors so that a reasonable jury could find a horizontal conspiracy. First, it notes that all of the competing TEC distributors complained to TEC about Miles's prices. This evidence, however, is insufficient to create a genuine issue of material fact. The Supreme Court has noted that such complaints are natural and unavoidable reac-

---

[7] (...continued)
*Roofing, Inc.*, 156 F.3d 452, 462 (3d Cir. 1998) (classifying a restraint as horizontal where a number of competitor firms agreed with each other and at least one of their common suppliers to eliminate their price-cutting competition by cutting its access to supplies). We therefore assume, without deciding the issue, that Miles may classify the alleged conspiracy as horizontal. Oddly, though, Miles does not name its competitors as defendants.

tions by distributors to the activities of their rivals. *See Monsanto*, 465 U.S. at 763. Miles must therefore point to evidence other than the complaints that reasonably suggests TEC and the other distributors "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 764 (internal quotation and citations omitted).

Miles next identifies threats made by various TEC distributors, noting that Virginia Tile threatened to carry a competing brand of installation products and that Louisville Tile threatened, among other things, to stop promoting the TEC brand. Miller Wholesale also threatened to bring in another line of installation products. As the Supreme Court noted in *Matsushita*, although all reasonable inferences must be drawn in favor of the non-movant on motions for summary judgment, antitrust law limits the range of inferences that can be drawn from ambiguous evidence in a § 1 case. 475 U.S. at 587-88. Thus, conduct that is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.* at 588. In this case, the distributors' threats are as consistent with permissible competition as with a conspiracy. Indeed, distributors can legitimately decide to carry or promote other brands if they are dissatisfied with reduced profits caused by price-cutters. Therefore, the fact that several of Miles's competitors told TEC that they were considering carrying or promoting other tile installation brands does not support the inference that Miles's competitors conspired together to boycott TEC.

Naturally, Miles attempts to identify additional evidence of concerted action among TEC distributors. He relies heavily on the email message between Mulder and Parker in which Parker refers to Miles's "poaching" and emphasizes that "our two companies take the high road and work together." He also refers to Virginia Tile's memo

stating that Miles's termination resulted from many discussions Virginia Tile and Miller Wholesale had with TEC management. Finally, Miles points to the post-termination sales blitz by competing distributors to capture business in Miles's territory. None of this evidence is sufficient to create a genuine issue of fact about the existence of a horizontal conspiracy. The statements from the email and memo are ambiguous at best. *See Bus. Elecs.*, 485 U.S. at 726 (expressing concern that if courts permit the inference of illegal concerted activity from highly ambiguous evidence it would unduly burden the marketplace). Furthermore, all other evidence about the sales blitz suggests that it resulted from distinct conversations between TEC and its distributors rather than concerted action among the distributors.

In short, the evidence, viewed in the light most favorable to Miles, does not suggest that the competing tile stores conspired to boycott TEC unless it terminated Miles. As a result, Miles cannot proceed under a horizontal group boycott analysis.

### D. Vertical Conspiracy

Miles also argues that it offered evidence from which a jury could find an illegal vertical conspiracy. The Supreme Court has held that a vertical restraint is not illegal per se unless it includes some agreement on price or price levels. *Bus. Elecs.,* 485 U.S. at 735-36. Although the post-termination sales blitz shows concerted activity between TEC and its distributors, Miles must still demonstrate that the concerted activity involved an agreement on price. *Id.*; *see also Monsanto*, 465 U.S. at 762 (recognizing that constant communication between a manufacturer and its distributors about prices and market strategy does not show that the distributors are not making pricing decisions independently).

*Monsanto* stands for the proposition that a jury cannot reasonably infer an agreement to fix prices from the fact that a termination came about in response to complaints about price. *See* 465 U.S. at 763. Evidence of price complaints or action in response to such complaints cannot support a conspiracy to fix prices in and of itself because suppliers may legitimately decide to retain their larger customers by terminating a price-cutting competitor. *See id.* That does not mean, however, that evidence of price complaints has no probative value at all. *Id.* at 764 n.8.

In this case, it is undisputed that the competing distributors, Virginia Tile, Louisville Tile, Sobol Sales, Miller's Wholesale and American Equipment complained about the prices Miles charged for TEC products. It is also clear that TEC covertly worked hand-in-hand with those distributors to formulate a plan to blitz the market as soon as it terminated Miles. Notably, TEC did not circulate a price list or suggest price margins to its distributors. Nonetheless, Miles asserts that TEC conspired with its other distributors to terminate Miles knowing that doing so would stabilize prices. Miles also emphasizes that TEC asked Miles to raise its prices.

Moreover, Miles highlights its competitors' actions after its termination as evidence that TEC and its distributors made quid pro quo arrangements in exchange for the termination. In contemplating its options, TEC sought assurances from its other distributors that they would work to recover sales lost in the event that Miles ceased distributing TEC products. During this time, Louisville Tile agreed to begin selling TEC product in its Chattanooga store where it had previously sold only a competing brand. Similarly, Virginia Tile agreed to increase the presence of TEC product in Cleveland and, in fact, did so after Miles was terminated.

Furthermore, once Miles was terminated, Virginia Tile represented in an internal memo that the termination resulted from discussions between Virginia Tile and Millers Wholesale and TEC management. The memo further emphasized that the termination was a result of a TEC decision. According to Miles, the memo shows that the termination was not solely a TEC decision, and that Virginia Tile was concerned enough to cover up its role in the decision.

As with the horizontal conspiracy, we must ask whether this evidence sufficiently excludes the possibility that TEC and its non-terminated distributors were acting independently. *Monsanto*, 465 U.S. at 764. There is no question that TEC and its other distributors acted in concert regarding non-price issues like retaining customer accounts and promoting the TEC product, even going so far as to blitz the market upon Miles's termination. Nonetheless, a reasonable jury could not infer concerted action to fix prices from the fact that TEC and its other distributors acted in concert in other respects. *See Monsanto*, 465 U.S. at 763 ("[I]t is of considerable importance that . . . concerted action on nonprice restrictions[ ] be distinguished from price-fixing agreements . . . ."). Nor could a jury infer a price fixing agreement from the fact that Miles's termination pleased its competitors. Clearly, the termination eliminated the downward pressure Miles put on TEC products in the market, but no reasonable jury could infer a price-fixing agreement from the fact that the prices stayed the same before and after Miles was terminated. *See Bi-Rite Oil Co. v. Ind. Farm Bureau Coop. Ass'n*, 900 F.2d 200, 203 (recognizing that many legitimate factors may lead to a decision to terminate a price-cutter).

Despite the paucity of its evidence, Miles argues that its evidentiary burden is lessened by the Supreme Court's decision in *Matsushita*. Miles argues that *Matsushita*

recognized the existence of a plausible motive to engage in an antitrust violation as a significant factor in determining whether a material issue of fact precludes summary judgment. 475 U.S. at 597. Therefore, Miles contends, because TEC had a plausible motive to conspire with its other distributors to terminate Miles, less evidence is necessary to raise an inference of an illegal agreement than would be necessary if no plausible motive existed. Miles misstates *Matsushita*, which actually says that:

> *the absence of any plausible motive* to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists . . . . Lack of motive bears on the range of permissible inferences that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.

*Id.* (emphasis supplied). The Court added in a footnote that it did not mean to imply that "if petitioners had had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of conspiracy," and noted that *Monsanto* still controlled the interpretation of ambiguous evidence. *Id.* at 597 n.21. In other words, a plausible motive for TEC to engage in anticompetitive behavior does not lessen Miles's evidentiary burden.

Finally, Miles cites cases from other circuits to argue that the allegedly pretextual justifications for its termination raise genuine issues of material fact as to whether TEC's actions were legal. *See Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1012 (3d Cir. 1994) (recognizing that where facts show that a defendant's proffered explanation for its actions is, in fact, pretextual, it tends to support an inference of concerted action); *Ezzo's*

*Invs., Inc. v. Royal Beauty Supply, Inc.*, 94 F.3d 1032, 1034-35 (6th Cir. 1996) (holding that a reasonable jury could infer a price-fixing conspiracy from a supplier's pretextual reason for cutting off a beauty product distributor).

Even assuming that TEC's initial reasons were pretextual, all of Miles's evidence suggests that it was terminated based on price complaints from other TEC distributors rather than an illegal price-fixing agreement. Because the Supreme Court has already said that manufacturers can legitimately terminate distributors based on price complaints, the fact that TEC offered different reasons initially does not change the analysis. Although pretextual reasons have some probative value, we hold that they are insufficient to create a genuine issue of fact without other evidence pointing to a price-fixing agreement. *See, e.g.*, *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1014 (2d Cir. 1989) (stating that mere fact that defendant's purported reason is undermined does not, by itself, justify the inference that the conduct was the result of a conspiracy). Taking the evidence as a whole, Miles has not shown that a genuine issue of fact exists regarding a price-fixing agreement.

## C.  Interference with Prospective Business Advantage

Under Indiana state law, in order to prevail on a tortious interference with prospective business relations claim, a plaintiff must prove: 1) the existence of a business relationship; 2) the defendant's knowledge of the existence of that relationship; 3) the defendant's intentional interference with that relationship; 4) the absence of any justification; and 5) damages. *Levee v. Beeching*, 729 N.E.2d 215, 222 (Ind. Ct. App. 2000). Where there is no contract, "illegal conduct is an essential element of tortious

interference with a business relationship." *Id.* Therefore, Miles's state tort claim rises or falls with its antitrust claim, which would supply the illegal conduct. Because Miles cannot succeed on its antitrust claims, we affirm the district court's grant of summary judgment on the state law claim as well.

### III. Conclusion

For the foregoing reasons, we Affirm the district court's entry of summary judgment in favor of the defendant.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*