862 So.2d 271 (2003)
SOUTHERN TOOL & SUPPLY, INC.
v.
BEERMAN PRECISION, INC., Industrial Welding Supply Co., Black & Decker, Inc.
No. 2003-CA-0960.
Court of Appeal of Louisiana, Fourth Circuit.
November 26, 2003.
*273 Joseph R. Ward, Jr., Lynn H. Frank, Ward Nelson, LLC, New Orleans, LA, for Plaintiff/Appellee (Southern Tool & Supply Co., Inc.).
Henry W. Kinney, III, Kinney & Ellinghausen, and Lawrence M. Lehmann, Lehmann, Norman & Marcus, L.L.C., New Orleans, LA, for Defendant/Appellant (Beerman Precision, Inc.).
Harry A. Rosenberg, Christopher K. Ralston, Phelps, Dunbar, L.L.P., New Orleans, LA, for Defendant/Appellant (Black & Decker (U.S.), Inc.).
Don M. Richard, Metairie, LA, for Defendant/Appellant (Industrial Welding & Supply Co.).
*274 (Court composed of Judge PATRICIA RIVET MURRAY, Judge MICHAEL E. KIRBY, Judge EDWIN A. LOMBARD).
PATRICIA RIVET MURRAY, Judge.
This is a state antitrust action. Pursuant to La. R.S. 51:135, which is a special statutory provision that authorizes an appeal from certain interlocutory rulings in antitrust cases, the three defendants Beerman Precision, Inc.; Industrial Welding & Supply Co.; and Black & Decker, Inc. ("Defendants")appeal the trial court's denial of their peremptory exception of no cause of action. For the reasons that follow, we affirm as to the plaintiff's (Southern Tool & Supply, Inc.'s) unreasonable restraint of trade claim and Louisiana Unfair Trade Practice Act ("LUTPA") claim; reverse as its monopolization and conspiracy to monopolize claims; and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND
In October 2000, Southern Tool commenced this suit against Defendants. In response, Defendants each filed several exceptions, including lack of subject matter jurisdiction and no cause of action. Reasoning that the antitrust claims were not confined to intrastate commerce, the trial court sustained the exception of lack of subject matter jurisdiction over the antitrust claims. Reversing, this court reasoned that this suit alleges anti-competitive effects occurring in Louisiana and thus is governed by this state's antitrust statute. This court also rejected Defendants' suggestion that it should reach the exception of no cause of action; instead, we remanded to the trial court for its consideration of that exception. Southern Tool & Supply, Inc. v. Beerman Precision, Inc., XXXX-XXXX (La.App. 4 Cir. 5/1/02), 818 So.2d 256, writs denied, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX (La.9/20/02), 825 So.2d 1177-79.
In our prior decision, we also summarized the facts as plead in Southern Tool's petition, stating:
[Southern Tool] was engaged in the business of selling power tools, hand tools, saw blades, grinding wheels, drill bits, and other equipment to contractors in the construction industry who were located primarily in the Orleans-Jefferson area. When [Southern Tool] first started doing business in December of 1996, it applied to be a distributor of Black & Decker products, especially the DeWalt line of tools and products. Black & Decker did not give [Southern Tool] a distributorship because of opposition from defendants Beerman and Industrial Welding.
In the fall of 1999, Mr. George Elstrott, a salesman for Black & Decker and De-Walt, told [Southern Tool] "that his sales of products to distributors were down" and that "he would try to persuade his superiors to authorize a distributorship for Southern Tool to help sales of DeWalt and Black & Decker Products in the Metropolitan New Orleans area." Thereafter, Mr. Charlie Kelly, Black & Decker's regional sales manager, agreed to let [Southern Tool] be a distributor. Black & Decker issued a distributor number to [Southern Tool] and allowed it to place an order for DeWalt and Black & Decker products at distributor prices. Mr. Elstrott told [Southern Tool] to keep a low profile with the new distributorship because Beerman and Industrial Welding would be upset.
[Southern Tool] placed its first order as a distributorship on November 1, 1999, whereby it ordered $11,572.00 worth of products as well as racks and supply stands to feature the DeWalt products.

*275 [Southern Tool] told approximately 130 customers that it would henceforth be a Black & Decker/DeWalt distributor and even persuaded one major electrical contractor to switch from another line of tools to Black & Decker.
When word got out that [Southern Tool] had become a distributor, Mr. Gary Hooter, vice president of sales for Industrial Welding, called Mr. Mark Beerman, president of Beerman, and together "they decided to `raise a stink' with Black & Decker about Southern Tool's distributorship." Specifically, Mr. Hooter and Mr. Beerman "agreed that they would call Black & Decker's home office to complain, that they would send back thousands of dollars worth of De-Walt merchandise in protest, and that they would threaten to end or downplay their promotion of Black & Decker and DeWalt products." Subsequently, Beerman and Industrial Welding shipped inventory back to Black & Decker. Beerman also canceled orders with Black & Decker.
Black & Decker caved in to pressure from Beerman and Industrial Welding. Specifically, on December 22, 1999, Mr. Elstrott (Black & Decker's sale representative) and Mr. Kelly (Black & Decker's regional sales manager) visited both Beerman and Industrial Welding and apologized for [Southern Tool] being a DeWalt distributor and told them that they would cancel [Southern Tool]'s distributorship.
Thereafter, Mr. Elstrott and Mr. Kelly met with the principals of Southern Tool to inform them that Black & Decker was canceling the distributorship contract with [Southern Tool] due to a market survey that showed Black & Decker had enough distribution in the Orleans Parish-Jefferson Parish area without adding [Southern Tool]. The principals of [Southern Tool] requested the opportunity for [Southern Tool] to show Black & Decker what it could accomplish. Further, they informed Mr. Keely and Mr. Elstrott that [Southern Tool] had already informed its customers about the new distributorship, and that Black & Decker's business reputation would be damaged by the sudden and unwarranted decision to cancel the distributorship.
The principals of [Southern Tool] later determined by making calls to other Black & Decker distributors, that no one had in fact been contacted by Black & Decker about a market survey. Further, the principals of [Southern Tool] learned from speaking with employees of Beerman, Industrial Welding, and Black & Decker, that Beerman and Industrial Welding had conspired and agreed to put pressure on Black & Decker to force them to cancel [Southern Tool]'s newly acquired distributorship status.
On December 22, 1999, Jay Baker, a principal of [Southern Tool], wrote Black & Decker's officer John Scheich in Towson, Maryland, warning that the decision to cut off [Southern Tool] after agreeing to make it a distributor would damage Southern Tool. On January 5, 2000, Mr. Baker called Bud Schreiber, Mr. Kelly's supervisor, to see if Black & Decker would reconsider termination of the dealership contract; Mr. Schreiber told Mr. Baker that Black & Decker would not reinstate the contract.
[Southern Tool] alleges that the cancellation of its distributorship damaged the business reputation of its company. Further, because [Southern Tool] had promoted the use of DeWalt products among its customers, [Southern Tool] was forced to buy DeWalt products from other distributors in order to supply the demand that it had created. [Southern Tool] alleges that "[b]uying through a *276 middlemen increased its costs by 10% to 20% per sale," and that it was not able to benefit from any special promotions.
Southern Tool, XXXX-XXXX at pp. 3-6, 818 So.2d at 258-60.
In its petition (paragraphs eighteen to twenty-four), Southern Tool asserted the following causes of action.

Louisiana Anti-Trust Laws (La. R.S. 51:121 et seq.)
The conduct of Black & Decker, Beerman Precision, and Industrial Welding constitutes a violation of the Louisiana anti-trust laws (LSA-R.S. 51:121 et seq.) in that the three defendants agreed that Southern Tool would not be allowed to have a DeWalt dealership. This agreement or oral contact not to deal with Southern Tool was an unreasonable restraint of trade. Additionally, or alternatively, the defendants conspired to monopolize part of the trade in DeWalt products. For purposes of this anti-trust action, the relevant geographic market is the Greater New Orleans area, including Orleans and Jefferson Parishes. The relevant product market is DeWalt power tools and accessories. Beerman and Industrial Welding conspired together to force Black & Decker not to deal with Southern.
Beerman, Industrial Welding, and Black & Decker are liable in solido for costs, attorney's fees and all damages, trebled, caused by the violations of the state anti-trust law described herein. Such damages include, without limitation, out-of-pocket costs, loss of business reputation, loss of profits, and loss of an opportunity to enter the market for the sale of DeWalt products.

Louisiana Unfair Trade Practices Act (La. R.S. 51:1401)
The conduct of Black & Decker, Beerman Precision, and Industrial Welding constitutes a violation of the Louisiana Unfair Trade Practices Act (LSA-R.S.51:1401) [("LUTPA") ]. As a business competitor of Beerman and Industrial Welding, Southern Tool has standing to maintain an action for damages caused by the cancellation of its distributorship. The economic pressure brought jointly by Beerman and Industrial Welding to cause the cancellation of Southern Tool's distributorship constitutes an unfair trade practice. Black & Decker is liable for acting in concert with Beerman and Industrial Welding to deprive Southern Tool of its rights as a distributor of DeWalt products.
As a result of the conspiracy of Beerman, Industrial Welding, and Black & Decker, competition in the sale and service of DeWalt products has been suppressed in the Greater New Orleans area.
Beerman, Industrial Welding, and Black & Decker are liable in solido for costs, attorney's fees, and all damages caused by the unfair trade practices described herein. Such damages include, without limitation, out-of-pocket costs, loss of business reputation, loss of profits, and loss of an opportunity to enter the market for the sale of DeWalt products.
Southern Tool, XXXX-XXXX at pp. 12-13, 818 So.2d at 263.
Following a hearing held on February 14, 2003, the trial court overruled Defendants' exception of no cause of action. In its reasons for judgment, the trial court stated:
Louisiana law provides that "no person shall monopolize, or attempt to monopolize, or combine, or conspire with any person to monopolize any part of the trade or commerce within this state." LSA-R.S. 51:123. The purpose of the Exception of No Cause of Action is to *277 determine whether in its petition plaintiff has alleged a valid cause of action. On the face of its Petition, in particularly in paragraph numbers 18-24, Southern Tool has clearly set forth allegations supporting a valid cause of action under LSA-R.S. 51:123.
Although the trial court's reasons refer only to § 123, the paragraphs of the petition to which it refers (paragraphs eighteen to twenty-four), which are quoted above, include Southern Tool's causes of action under both § 122 and § 123 of the Louisiana anti-trust laws as well as under LUTPA.[1] For purposes of this appeal, we assume that the trial court overruled Defendants' exceptions as to all three of the causes of action asserted in those paragraphs of the petition, and we separately address each of those causes of action. Before doing so, we enunciate the principles governing the peremptory exception of no cause of action.

NO CAUSE OF ACTION PRECEPTS
We review a trial court's decision on an exception of no cause of action de novo "because the exception raises a question of law and the lower court's decision is based only on the sufficiency of the petition." City of New Orleans v. Board of Comm'rs of Orleans Levee Dist., 93-0690, p. 28 (La.7/5/94), 640 So.2d 237, 253. In so doing, we are confined to the allegations of the petition. No evidence can be introduced to support or to controvert an exception of no cause of action. La. C.C.P. art. 931. Rather, we must accept as true the well pleaded factual allegations set forth in the petition. Based thereon, our job is to determine "whether, on the face of the petition, the plaintiff is legally entitled to the relief sought." Everything on Wheels Subaru, Inc. v. Subaru South, Inc., 616 So.2d 1234, 1235 (La.1993).
A defendant's peremptory exception of no cause of action is designed to test the legal sufficiency of the plaintiff's petition. It poses the question "whether the law affords a remedy on the facts alleged in the pleading." Id. Louisiana has a system of fact pleading, and "[t]he mere conclusion of the pleader unsupported by facts does not set forth a cause or right of action." Montalvo v. Sondes, 93-2813, p. 6 (La.5/23/94), 637 So.2d 127, 131. As we recently noted, "[i]t is insufficient to state a cause of action where the petition simply states legal or factual conclusions without setting forth facts that support the conclusions." Bibbins v. City of New Orleans, XXXX-XXXX, p. 5 (La.App. 4th Cir.5/21/03), 848 So.2d 686, 691, writ denied, XXXX-XXXX (La.10/10/03), 855 So.2d 357.
The exceptor has the burden of proving that the petition fails to state a cause of action. This burden serves the public policy of affording the plaintiff his day in court to present his case. "When it can reasonably do so, the court should maintain a petition against a peremptory exception so as to afford the litigant an opportunity to present his evidence." Kuebler v. Martin, 578 So.2d 113, 114 (La.1991). "An exception of no cause of action is likely to be granted only in the unusual case in which the plaintiff includes allegations that show on the face of the petition that there is some insurmountable bar to relief." City of New Orleans v. Board of Directors of Louisiana State Museum, 98-1170, p. 10 (La.3/2/99), 739 So.2d 748, 756. "If two or more causes of action are based on separate and distinct operative facts, partial grants of the exception of no cause of *278 action may be rendered while preserving other causes of action." Plaquemine Marine, Inc. v. Mercury Marine, XXXX-XXXX, p. 4 (La.App. 1st Cir.7/25/03), 859 So.2d 110, 115.
With those principles in mind, we turn to the causes of action pled in paragraphs eighteen to twenty-four of Southern Tool's petition.

LOUISIANA ANTITRUST LAWS (La. R.S. 51:121 et seq.)
Southern Tool cited in its petition both the Louisiana antitrust statute, La. R.S. 51:122, and the Louisiana anti-monopoly statute, La. R.S. 51:123. Because these provisions track almost verbatim Sections 1 and 2 of the Sherman Act, Louisiana courts have turned to the federal jurisprudence analyzing those parallel federal provisions for guidance. Plaquemine Marine, supra; Reppond v. City of Denham Springs, 572 So.2d 224, 228, n. 2 (La.App. 1st Cir.1990)(citing Louisiana Power & Light Co. v. United Gas Pipe Line Co., 493 So.2d 1149 (La.1986) for the proposition that federal jurisprudence interpreting the Sherman Act is "persuasive in interpreting Louisiana antitrust statute.") We separately analyze the Defendants' contentions that Southern Tool failed to state a cause of action under either of those two provisions.
(1) Unreasonable Restraint of Trade (La. R.S. 51:122)
Defendants contend that Southern Tool's petition fails to state a cause of action for restraint of trade under § 122 for several reasons. First, they argue that the alleged restraint was a vertical conspiracy between participants at different levels of the distribution chaindistributors and a manufacturer. As such, they argue that the rule of reason applies; that rule (discussed below) requires the plaintiff prove harm, not just to itself (a single competitor) but to competition itself. Black & Decker also argues that, under that rule, its decision to terminate its relationship with a former distributor was a business decision, not an antitrust violation. Defendants further argue that Southern Tool failed to allege an essential element of an unreasonable restraint of trade claim: antitrust injury or injury to competition. They stress the well-settled principle that the antitrust laws protect competition, not competitors. They argue that Southern Tool's allegation of injury to itself is insufficient to state a cause of action. Finally, they argue that, contrary to Southern Tool's argument, all horizontal conspiracies are not per se illegal. Regardless, they argue that proof of antitrust injury is required even for per se violations.
Southern Tool concedes that it was required to show antitrust injury, but stresses that antitrust injury and injury to competition are two distinct concepts. Southern Tool contends that it was not required to show that Defendants' conspiracy had an actual adverse effect on competition because it alleged a horizontal conspiracy. As such, it argues that the per se rule (discussed below) applies and that under that rule injury to competition is conclusively presumed. Southern Tool further contends that the fact Black & Decker (a manufacturer) was coerced to join the conspiracy of Beerman and Industrial Welding (distributors) does not destroy the horizontal nature of the conspiracy. In support, Southern Tool cites Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), which involved a horizontal conspiracy between several manufacturers, several distributors, and a single retailer.
To resolve this issue we review the current antitrust jurisprudence. As noted *279 above, Section 122 is a counterpart to Section 1 of the Sherman Act. Despite the literal wording of these provisions, the jurisprudence has construed them as reaching only those combinations that are unreasonable. In determining whether a given combination is unreasonable, the current antitrust jurisprudence generally employs two polar categories of scrutiny: the rule of reason and the per se rule. 2 Kitner Federal Antitrust Law § 11.22 (2002).[2]
The rule of reason, which Louisiana courts have adopted in certain cases, is the prevailing antitrust law standard. See Louisiana Power & Light Co. v. United Gas Pipe Line Co., 518 So.2d 1050, 1053 (La.App. 4th Cir.1987)(noting rule of reason to be "preferred method of analyzing restraint of trade claims"). As its name implies, this rule requires a court to determine if a particular agreement imposes an unreasonable restraint on competition based on all the circumstances of the particular case. The classic statement of that rule is as follows:
The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable.
Board of Trade of City of Chicago v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Under this rule, the only relevant question is whether the plaintiff has pled and proved "harm, not just to a single competitor, but to the competitive process, i.e., to competition itself." NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135, 119 S.Ct. 493, 498, 142 L.Ed.2d 510 (1998).
At the other end of the spectrum is the per se rule. Under that rule, the court conclusively presumes that certain restraints are so pernicious and so likely to harm competition that they are deemed unreasonable on their face. "[C]ertain kinds of agreements will so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances." NYNEX, 525 U.S. at 133, 119 S.Ct. at 497. "Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable." Arizona v. Maricopa County Medical Soc'y, 457 U.S. 332, 344, 102 S.Ct. 2466, 2473, 73 L.Ed.2d 48 (1982).
Historically, the antitrust laws have drawn a definite distinction between vertical and horizontal restrictions; however, that line is not always easy to draw because in some cases "it can be hard as a matter of fact to be sure what kind of agreement is at issue." Toys "R" Us, Inc. v. Federal Trade Comm'n, 221 F.3d 928, 930 (7th Cir.2000). Characterization is the analytical process by which a court draws that line and thereby determines which rule applies. Kitner, supra at §"11.23.
*280 The challenged restraint is pigeonholed based on its directionhorizontal or vertical.
Vertical restraints occur up and down the distribution chain. They are "imposed by persons at different levels of distribution, usually by one higher up the distribution chain than the party restrained." Plaquemine Marine, XXXX-XXXX at p. 8, 859 So.2d at 117. Except for vertical restraints involving price, this category of restraint is governed by the rule of reason. As noted, Defendants contend the agreement at issue in this case falls into the category of a vertical, non-price restraint governed by the rule of reason.
Horizontal restraints are agreements among competitors at the same level of distribution. They "come about as a result of agreements among competitors." Toys "R" Us, 221 F.3d at 930. Because the antitrust laws are aimed at preserving competition, the courts have recognized that "agreements among competitors are more likely to reduce competition than other types of agreement, particularly `vertical' ones, those between buyers and sellers." Kitner, supra at § 11. Predictably, the per se rule has been applied to several types of horizontal restraints, including certain group boycotts or concerted refusals to deal. As noted, Southern Tool contends the agreement at issue falls into the category of a horizontal, group boycott restraint governed by the per se rule.
Recently, the United States Supreme Court reformulated the rule regarding the characterization of group boycotts or refusals to deal. Applying modern economic analysis of restraints of trade and imposing "an economically informed characterization inquiry" that necessarily precedes applying the per se rule, the Supreme Court has confined the per se category to a narrow set of "classic or naked boycotts." Kitner, supra at § 11.40 (citing Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co., 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985)). In so doing, the Supreme Court identified certain characteristics in its earlier cases, such as Klor's, that continue to justify per se treatment. For instance, in NYNEX, supra, the Supreme Court stressed that although Klor's "involved a threat made by a single powerful firm, it also involved a horizontal agreement among those threatened, namely, the appliance suppliers, to hurt a competitor of the retailer who made the threat." NYNEX, 525 U.S. at 136, 119 S.Ct. 493. That horizontal dimension of the restraint, absent a plausible efficiency justification, is what the court found warranted application of the per se rule. Kitner, supra at § 11.42.
Summarizing the reformulated rule enunciated in NYNEX and Northwest Wholesale, a commentator noted that there are now four minimum criteria for per se illegality of such agreements; to wit:
(1) A horizontal elementan agreement among competitors at some level of manufacture or distribution.
(2) A vertical elementan effort to deny needed supplies, channels of distribution, or facilities necessary for the target firm to compete.
(3) The parties to the agreement must have a sufficiently dominant market position to make the arrangement plausible as a means of excluding competition.
(4) The agreement must lack a plausible competitive justification [i.e., no efficiency justification for the agreement].
Kitner, supra at § 11.42. The Supreme Court in Northwest Wholesale labeled these factors as "structural characteristics." 472 U.S. at 297, 105 S.Ct. at 2621.
*281 A recent case in which an agreement was found to have these structural characteristics is Toys "R" Us, supra. The giant toy retailer Toys "R" Us ("TRU") acted as "ring leader" to coordinate a horizontal agreement among several toy manufacturers. The agreement at issue was described as "a network of vertical agreements between TRU and the individual manufacturers, in each of which the manufacturer promised to restrict the distribution of its products to low priced warehouse club stores, on the condition that other manufacturers would do the same." 221 F.3d at 930. Characterizing this agreement as a horizontal conspiracy, the court reasoned that TRU "was trying to disadvantage the warehouse clubs, its competitors, by coercing suppliers to deny the clubs the products they needed." 221 F.3d at 936. The court further reasoned that "[TRU] accomplished this goal by inducing the suppliers to collude, rather than to compete independently for shelf space in the different toy retail stores." Id. Concluding that the structural characteristics for applying the per se rule were present, the court stated:
(1) the boycotting firm has cut off access to a supply, facility or market necessary for the boycotted firm (i.e., the clubs) to compete;
(2) the boycotting firm possesses a "dominant" position in the market (where "dominant" is an undefined term, but plainly chosen to stand for something different from antitrust's term of art "monopoly"); and
(3) the boycott ... cannot be justified by plausible arguments that it was designed to enhance overall efficiency.
221 F.3d at 936. The court noted, however, that the requirement of establishing market power for application of the per se rule under Section 1 is less than that required for a monopolization claim under Section 2. Toys "R" Us, 221 F.3d at 936.
The jurisprudential emphasis on the structural characteristics of the arrangements is significant. "Although a group boycott usually has both vertical and horizontal characteristics, `it is the horizontal element that justifies applying a rule of per se illegality.'" Com-Tel, Inc. v. DuKane Corp., 669 F.2d 404, 409, n. 6 (6th Cir.1982). Indeed, in Klor's, the Supreme Court stressed the structural characteristics of the arrangement, noting that "[t]his is not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship. Alleged in this complaint is a wide combination consisting of manufacturers, distributors, and a retailer." Klor's, 359 U.S. at 213, 79 S.Ct. at 710.
By analogy, as Southern Tool suggests, this is not a case in which Black & Decker unilaterally terminated its distributorship. Nor is this a case in which Beerman and Industrial Welding separately and independently exerted pressure on Black & Decker to join the conspiracy and to terminate Southern Tool's distributorship. Assuming the allegations of the petition to be true, this is a classic horizontal, group boycott, like in Klor's, to which the per se rule applies.
We recognize, as Black & Decker argues, the well-settled principle that a business "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). However, businesses must "avoid any entanglement in horizontal conductwhether between their own competitors or between competitors of a supplier or distributor." Margaret M. Zwisler, The Susceptibility of Vertical Restraints *282 to Summary Adjudication: Procedural Avenues to Substantive Objectives, 67 Antitrust L.J. 327, 337 (1999). The presence of a horizontal entanglement is what brings a refusal to deal or boycott case within the per se category and precludes summary adjudication. Id. Such is the case here.
All four structural requirements for per se characterization of an agreement are satisfied by the allegations of Southern Tool's petition. The horizontal dimension is satisfied by the alleged agreement between Beerman and Industrial Welding jointly to raise a stink and to put pressure on Black & Decker to terminate the distributorship. The vertical dimension is satisfied by Black & Decker's participation in the conspiracy. The requirement of sufficient market position to make the agreement plausible is satisfied by both the termination itself and by Southern Tool's allegation that Defendants jointly acted to exclude competition from the market. As Southern Tool claims, this allegation implicitly "includes the allegation that Beerman and Industrial Welding had the power to exclude competition" and that they coerced Black & Decker to eliminate Southern Tool as a competitor on equal footing. Finally, we find no plausible competitive justification for the restraint. We thus find that Southern Tool's petition sufficiently pleads a horizontal entanglement among Defendants to bring this case within the ambit of the per se rule.
Even in cases involving a per se violation of the Sherman Act, the plaintiff is not relieved of the requirement of pleading antitrust injury. Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Antitrust injury is defined as the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). As Southern Tool stresses, "antitrust injury" is not the same as the substantive requirement of injury to competition. These are two distinct concepts that serve two distinct purposes. Explaining that distinction, the Supreme Court in Atlantic Richfield noted:
The per se rule is a method of determining whether § 1 of the Sherman Act has been violated.... It represents a "longstanding judgment that the prohibited practices by their nature have `a substantial potential for impact on competition.'"....
The purpose of the antitrust injury requirement is different. It ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs.... The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition reducing aspect or effect of the defendant's behavior.
495 U.S. at 342-43, 110 S.Ct. at 1893-94.
Harmonizing the antitrust injury requirement with the per se rule, the court in Pace Electronics, Inc. v. Canon Computer Systems, Inc., 213 F.3d 118, 124 (3rd Cir. 2000), reasoned that "[i]mplicit in the United States Supreme Court's approach is that a plaintiff who had suffered loss as a result of an anticompetitive aspect of a per se restraint of trade agreement would have suffered antitrust injury, without demonstrating that the challenged practice had an actual, adverse economic effect on a relevant market." 213 F.3d at 124.
The defendants in Pace, supra, similar to Defendants in this case, argued that "a *283 terminated dealer seeking to establish that it has suffered antitrust injury must allege facts demonstrating that its termination as an authorized dealer resulted in an actual, adverse economic effect on competition in a relevant interbrand market" 213 F.3d at 123. Rejecting that argument, the court reasoned that to impose such a requirement would come "dangerous[ly] close to transforming a per se violation into a case to be judged under the rule of reason" and "would, in substance, be removing the presumption of anticompetitive effect implicit in the per se standard under the guise of the antitrust injury requirement." Id. The court noted that the issue is thus "not whether the plaintiff's alleged injury produced an anticompetitive result, but, rather, whether the injury claimed resulted from the anticompetitive aspect of the challenged conduct." Id. In the same vein, another court noted that antitrust injury should "be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition." Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc., 123 F.3d 301, 305 (5th Cir. 1997).
Analyzing the meaning of the antitrust injury requirement, a commentator stated:
Very simply, the doctrine of antitrust injury requires a court to examine not only whether the acts the defendant allegedly committed violate the law but also why they violate the law. The doctrine, in other words, directs a court to examine, in a proper case, what economic effects the case law rule or statute in question seeks to prevent.... Having examined the purposes of the relevant rule, the court must then consider the damages claimed by the plaintiff, to determine whether the injury flows form one of the condemned effects. If so, there is antitrust injury; if not, there is no antitrust injury.
Ronald W. Davis, Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury, 70 Antitrust L.J. 697, 723 (2003).
Group boycotts or concerted refusals to deal are unlawful under the antitrust laws "because their purpose and effect is to reduce competition by driving the plaintiff from the market." Lee-Moore Oil Co. v. Union Oil Co. of California, 599 F.2d 1299, 1304 (4th Cir.1979). In Lee-Moore, supra, the court found the antitrust injury requirement satisfied despite the fact the plaintiff was still in business and had continued to prosper. The court reasoned that it is not necessary that a plaintiff be driven from the market to establish antitrust injury. The court stressed the Supreme Court's express holding in Brunswick, supra, that "a plaintiff need not prove an actual lessening of competition in order to show `antitrust injury.'" Lee-Moore, 599 F.2d at 1304. Significantly, the court stated that "the case will be quite rare in which a per se violation of the Sherman Act does not cause competitive injury." 599 F.2d at 1303; see also Doctor's Hospital of Jefferson, 123 F.3d at 306 (commenting that "standing should not become the tail wagging the dog in `classic' antitrust cases such as this one by an alleged excluded competitor.")
Applying those principles here and viewing the antitrust injury issue from the perspective of Southern Tool's position as a competitor in the marketplace, we find that this is not the rare case in which an alleged per se violation does not cause antitrust injury. Rather, we find that the alleged injuries flow from Defendants' exclusionary conduct in conspiring to terminate Southern Tool's distributorship. The alleged injuries clearly flow from the "competition reducing" aspect of Defendants' *284 conspiracy to eliminate Southern Tool as a competitor on equal footing. We thus find the antitrust injury requirement satisfied. We further find that the trial court did not err in overruling Defendants' exception of no cause of action as to Southern Tool's unreasonable restraint of trade claim under Section 122.
(2) Monopolization (La. R.S. 51:123)
Defendants contend that the monopolization claim under Section 123 fails to state a cause of action given Southern Tool's failure to plead monopoly power in the properly established relevant market of power tools and accessories. Particularly, Defendants argue that this case is analogous to Plaquemine Marine, supra, in which the court dismissed on an exception of no cause of action a Section 123 claim due to the plaintiff's failure to properly plead the relevant market.
Southern Tool counters that its petition fairly stated a monopolization claim in that it alleges Beerman and Industrial Welding excluded competition from the market for sale of DeWalt power tools and accessories to industrial contractors in the greater New Orleans area. According to Southern Tool, this allegation implicitly "includes the allegation that Beerman and Industrial Welding had the power to exclude competition" and that Black & Decker joined with them by terminating the distributorship. Southern Tool further stresses that monopoly power is defined disjunctively as either the ability to control price or the ability to exclude competition. See Louisiana Power & Light Co., 493 So.2d at 1162, n. 21.
As noted, Section 123 is the Louisiana counterpart to Section 2 of the Sherman Act. Both Section 2 of the Sherman Act and Section 123 contain three separate claims: (i) monopolization, (ii) attempted monopolization, and (iii) conspiracy to monopolize. Although the arguments by the parties on appeal focused on a monopolization claim, Southern Tool's petition pleads a conspiracy to monopolize claim. We thus address both types of monopoly claims.
As to Southern Tool's monopolization claim, we find Defendants' argument that the petition fails to plead such a claim persuasive. As in Plaquemine Marine, supra, Southern Tool's petition fails to properly plead the relevant market.
The relevant market is defined as "the area of effective competition within which the defendant operates" and includes both a product and a geographic market. Louisiana Power & Light Co., 493 So.2d at 1161, n. 32. The geographic market is "a section of the country, the area in which sellers of a particular product or service operate and to which buyers turn to purchase the product or service." Id. The product market "encompasses the differences among various commodities and the willingness of buyers to substitute one product for another." Plaquemine Marine, XXXX-XXXX at p. 12, 859 So.2d at 119.
Finding the plaintiffs failed to state a monopolization claim, the court in Plaquemine Marine, supra, reasoned that the plaintiffs' petition was deficient in that it failed to make any reference to the "economic market, i.e., the scope of other products against which it must compete." Plaquemine Marine, XXXX-XXXX at p. 13, 859 So.2d at 120. The court further found the petition deficient in that it failed to allege either damage to interbrand competition or that defendant sells a unique product for which there is no competition from other brands of similar products. Id.
We find Southern Tool's petition suffers from these same pleading deficiencies. As in Plaquemine Marine, Southern Tool's *285 petition fails to define the relevant market in which the monopoly allegedly is exercised. We thus find it failed to state a monopolization claim.
As to its conspiracy to monopolize claim, Section 123 provides that "[n]o person shall ... conspire with any other person to monopolize any part of the trade or commerce within this state." La. R.S. 51:123. The four elements enumerated in the jurisprudence (which Industrial Welding cites in its brief) for a conspiracy to monopolize claim are as follows:
(1) the existence of specific intent to monopolize;
(2) the existence of a combination or conspiracy to achieve that end;
(3) overt acts in furtherance of the combination or conspiracy; and
(4) an effect upon a substantial amount of interstate commerce.
Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Centers, Inc., 200 F.3d 307, 316 (5th Cir.2000).
There presently exists a conflict in the federal jurisprudence over whether a plaintiff alleging a conspiracy to monopolize must also establish a fifth element: proof of the relevant market. "A minority of the federal courts have held, when the a charge is attempt (or conspiracy) to monopolize, rather than monopolization, that the relevant market is not an issue." 10 A Fletcher Cyc. Corp. § 4983.11 (Perm. Ed.).[3] However, the majority of the federal courts, including the Fifth Circuit, have held that "[t]o establish Section 2 violations premised on attempt and conspiracy to monopolize, a plaintiff must define the relevant market." Doctor's Hospital of Jefferson, 123 F.3d at 311. Imposing such a requirement is consistent with Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993), which held that proof of an intent to monopolize requires "inquiry into the relevant product and geographic market and the defendant's economic power in that market." Id. We find that majority position persuasive. We further find that Southern Tool's failure to plead the relevant market is fatal to its conspiracy to monopolize claim.
In sum, we find the trial court erred in denying Defendants' exception of no cause of action as to Southern Tool's monopolization and conspiracy to monopolize claims under Section 123.

LUTPA claim (La. R.S. 51:1401, et seq.)
Defendants' final assignment of error is that the trial court erred in denying their exception of no cause of action as to Southern Tool's LUTPA claim. We find this argument unpersuasive. The LUTPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." La. R.S. 51:1405. A practice is unfair "`when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious.'" JCD Marketing Co. v. Bass Hotels and Resorts, Inc., XXXX-XXXX, p. 12 (La.App. 4th Cir.3/6/02), 812 So.2d 834, 842 (quoting Lilawanti Enterprises, Inc. v. Walden Book Co., 95-2048, p. 6 (La.App. 4 Cir. 2/29/96), 670 So.2d 558, 561). Given this broad jurisprudential definition, the determination of what is an unfair trade violation under the LUTPA must be made on a *286 case-by-case basis. Roustabouts, Inc. v. Hamer, 447 So.2d 543, 548 (La.App. 1st Cir. 1984).
The jurisprudence has held that there is no LUTPA violation when the alleged conduct is simply "the appropriate exercise of good business judgment and the proper workings of free enterprise." Monroe Medical Clinic, Inc. v. Hospital Corp. of America, 522 So.2d 1362, 1365 (La.App. 2d Cir.1988). Stated another way, "`[b]usinesses in Louisiana are still free to pursue profit, even at the expense of competitors, so long as the means used are not egregious.' " JCD Marketing, XXXX-XXXX at p. 13, 812 So.2d at 842 (quoting Turner v. Purina Mills, Inc., 989 F.2d 1419, 1422 (5th Cir.1993)). However, when, as in this case, Defendants' conduct allegedly violates the antitrust laws, a valid LUTPA claim has been stated. See Anthony J. Rollo, Jr., and Roger A. Stetter, The Private Cause of Action under Louisiana's Unfair Trade Practices and Consumer Protection Law, 34 La. B.J. 344, 346 (April 1987)(noting that jurisprudence under the analogous FTC Act defines unfair methods of competition to include "fully hatched" antitrust violations such as group boycotts). We thus find no error in the trial court's denial of Defendants' exception of no cause of action as to Southern Tool's LUTPA claim.

DECREE
For the foregoing reasons, we reverse the judgment of the trial court overruling the exceptions of no cause of action filed by DefendantsBeerman Precision, Inc.; Industrial Welding & Supply Co.; and Black & Decker, Inc. as to Southern Tool's monopolization and conspiracy to monopolize claims under La. R.S. 51:123. We affirm the judgment overruling the Defendants' exceptions as to Southern Tool's unreasonable restraint of trade claim under La. R.S. 51:122 and LUTPA claim under La. R.S. 51:1401. And, we remand for further proceedings consistent with this opinion.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
NOTES
[1] The trial court quoted § 123 in its reasons; § 122 provides in pertinent part as follows: "every ... conspiracy in restraint of trade or commerce in this state is illegal." La. R.S. 51:122.
[2] A third, mid-level category has been recognized called the "quick look" rule. See Continental Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 508-09 (4th Cir.2002)(noting that boundaries between the three categories are fluid). This category reflects the "recent decisions indicat[ing] a tension between a per se rule and a more flexible approach." 10 A Fletcher Cyc. Corp. § 4973 (Perm. Ed.). This category, however, is not applicable to this case.
[3] The minority position is articulated in Monument Builders of Greater Kansas City, Inc. v. American Cemetery Assn. of Kansas, 891 F.2d 1473, 1484 (10th Cir. 1989), which held that "`conspiracy to monopolize is a separate offense under Section 2, requiring less in the way of proof than the other Section 2 offenses' " and cited as an example that "the `market power in a `relevant market' need not be proved.'" Id.