DANIEL L. DYSART, Judge.
| 1Plaintiff-appellant, Larry Willis, appeals the trial court’s grant of two summary judgments, dismissing his claims against defendants-appellees, Autozone,[1] Stan Carpenter,[2] Matthew Brooks, Avenue D Developments, LLC, (“Avenue D”) and Magazine Street Interests (“MSI”). For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
Larry Willis filed the instant lawsuit under the Louisiana Unfair Trade Practices and Consumer Protection Law (“LUTPA”) seeking actual damages for the loss of an alleged business opportunity, as well as treble damages, attorney’s fees and costs pursuant to La. R.S. 51:1409. Willis alleges that, as a commercial real estate developer, he discussed the purchase of a tract of land on Chef Menteur Highway with his “longtime acquaintance,” Richie Stevens, the then-owner of the property, contingent upon Willis’ ability to locate a commercial tenant to lease the 1 ^property.[3] In connection with his intent to purchase and then lease the land to a commercial tenant, Willis provided defendant-appellee, Autozone, with a detailed “site submittal” to determine the latter’s interest in locating an Autozone store at the site. Willis alleges that Autozone, through its employee, Stan Carpenter, arranged to have one of its “real estate experts,” Matthew Brooks, meet with Willis at the site. Willis and Brooks met at the site in February, 2009, following which Brooks allegedly advised that Autozone would be interested in the property. Brooks indicated that he would contact Willis later for further discussions.
According to Willis, after several weeks during which he unsuccessfully tried to reach Brooks, he contacted Carpenter, who advised that Autozone was not interested in the property. However, in June, 2009, Willis learned from Stevens that the property had been sold to Avenue D, which intended to lease the property to a then-unidentified retail chain. Willis then learned that Brooks is either an employee of and/or has an ownership interest in Avenue D and MSI (alleged to be a company related to Avenue D),[4] which purchased the property with the intent to lease it to Autozone.
Based on the foregoing allegations, Willis maintains that the defendants-appel-lees, knowing of his intentions with respect to the property, conspired with one another to allow Brooks, Avenue D and MSI to purchase the property and lease it to Auto-Zone, all of which deprived him of a business opportunity and [¡¡violated the LUT- *892 PA. Willis maintains that the defendants-appellees’ actions were “unfair and/or deceptive acts and practices in the conduct of commerce.”
Two motions for summary judgment were filed: one by Brooks, Avenue D and MSI (collectively, “Brooks defendants”) and the other by Autozone and Carpenter.[5] By judgments dated July 23, 2012 and October 22, 2012, respectively, the trial court granted both motions. Willis timely appealed both judgments.
STANDARD OF REVIEW
This Court recently reiterated the well-settled rule that appellate courts are to review the granting of a summary judgment de novo under the same criteria governing the trial court’s consideration of whether summary judgment is appropriate. Serou v. Touro Infirmary, 12-0089, p. 48 (La.App. 4 Cir. 1/9/13), 105 So.3d 1068, 1100, writ denied, 13-0377 (La.4/1/13), 110 So.3d 588. Under La. C.C.P. art. 966(B), a summary judgment is to be granted when “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that [the] mover is entitled to judgment as a matter of law.”
Noting that summary judgments are favored and that the summary judgment procedure is designed to secure “the just, speedy and inexpensive determination of actions,” we summarized the parties’ burdens of proof in Johnson v. Loyola University of New Orleans, 11-1785, pp. 7-8 (La.App. 4 Cir. 8/8/12), 98 So.3d 918, 923-24 as follows:
The code provides that where the party moving for summary judgment will not bear the burden of proof at trial, their burden does not require them to negate all essential elements of the adverse party’s claim, but rather to point out to the court that an absence of factual support exists for one or more elements essential to the adverse party’s claim. Thereafter, if the adverse party fails to produce factual support sufficient to establish that it will be able to satisfy its eviden-tiary burden of proof at trial, no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law. The adverse party cannot rest on the mere allegations or denials of his pleadings when a motion for summary judgment is made and supported by affidavits, but is required to present evidence establishing that material facts are still at issue.
DISCUSSION
LUTPA prohibits “[ujnfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce” La. R.S. 51:1405(A). A right of action is afforded to “[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405.” La. R.S. 51:1409(A). LUTPA does not provide any guidelines as to what constitutes unfair methods of competition or unfair/deceptive acts or practices, and the courts are to decide, on a case-by-case basis, what conduct falls within the statute’s prohibi *893 tion. Cheramie Services, Inc. v. Shell Deepwater Production, Inc., 09-1633, p. 10 (La.4/23/10), 35 So.3d 1053, 1059, citing Dufau v. Creole Engineering, Inc., 465 So.2d 752, 758 (La.App. 5th Cir.1985), (In order to recover under LUTPA a plaintiff must prove “some element | fiof fraud, misrepresentation, deception, or other unethical conduct” on the part of the defendant).
As the Cheramie court explained, “under this statute, the plaintiff must show the alleged conduct ‘offends established public policy and ... is immoral, unethical, oppressive, unscrupulous, or substantially injurious.’ ” Id., pp. 10-11, 35 So.3d at 1059. (Emphasis added). See also, Lilawanti Enterprises, Inc. v. Walden Book Co., Inc., 95-2048, P. 6 (La.App. 4 Cir. 2/29/96), 670 So.2d 558, 561 (“A practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious.”); Dixie Sav. and Loan Ass’n v. Pitre, 99-154, p. 21 (La.App. 5 Cir. 7/27/99), 751 So.2d 911, 923 (“For conduct to be unfair it must offend established public policy”).
The Cheramie court noted that the range of prohibited practices under LUT-PA is extremely narrow, citing Turner v. Purina Mills, Inc., 989 F.2d 1419, 1422 (5th Cir.1993), for the principles that:
LUTPA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions. The statute does not forbid a business to do what everyone knows a business must do: make money. Businesses in Louisiana are still free to pursue profit, even at the expense of competitors, so long as the means used are not egregious. Finally, the statute does not provide an alternate remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes. [Citations omitted.]
Id., p. 11, 35 So.3d at 1060. See also, JCD Marketing Co. v. Bass Hotels and Resorts, Inc., 01-1096 (La.App. 4 Cir. 3/6/02), 812 So.2d 834.
Our jurisprudence reflects that violations of LUTPA will be found when there is a clear showing of fraud, misrepresentation, deception, or other unethical conduct. In Southern Tool & Supply, Inc. v. Beerman Precision, Inc., 03-0960 (La.App. 4 Cir. 11/26/03), 862 So.2d 271, for example, this Court affirmed the trial court’s denial of an exception of no cause of action in a case by a local distributor against other distributors and a manufacturer which allegedly conspired to cause the manufacturer to cancel its distributorship. The Court found that because “[d]e-fendant’s conduct allegedly violates the antitrust laws, a valid LUTPA claim has been stated.” Id., p. 22, 862 So.2d at 286.
Similarly, in Camp, Dresser & McKee, Inc. v. Steimle and Associates, Inc., 94-547 (La.App. 5 Cir. 2/15/95), 652 So.2d 44, the Court concluded that a prima facie showing of a LUTPA violation was made where an engineering firm hired a detective agency to rummage through a competitor’s trash dumpsters, then released for publication by local newspapers “selective and misleading information.”
Conversely, in JCD Marketing Co., supra, this Court found no violation of LUT-PA where the defendant-hotel allegedly misrepresented “the availability of rooms and purposefully induced JCD to rely on those misrepresentations to ensure the Hotel’s rooms were fully booked.” In rejecting the plaintiffs argument that the defendant’s conduct was “unscrupulous,” the Court noted that our jurisprudence “has declined to find LUTPA violations when the alleged conduct was simply a *894 ‘normal business relationship.’ ” Id., p. 12, 812 So.2d at 842.
Likewise, in Cajun Restaurant & Bar, Inc. v. Maurin-Ogden 1978 Pinhook Plaza, 574 So.2d 536, 538 (La.App. 3 Cir.1991), the defendant sued plaintiff, its tenant, for past-due rent and obtained a judgment in its favor. After the sheriff seized plaintiffs movable property, the defendant purchased it at a sheriffs sale. Rejecting a claim under LUTPA, the Third Circuit held that “the Sheriffs sale was not part of any unfair trade practice ... This bidding can[not] be ... an unfair trade |7practice because it was entirely permitted by our law.... This entirely proper use of legal process is not part of any unfair trade practice.... ”
Our jurisprudence further reflects that mere conclusory allegations of LUTPA violations are insufficient to sustain a claim under the statute. See, e.g. Lilawanti, supra, 670 So.2d at 561 (plaintiffs conclu-sory allegations that lessors’ refusal to consent to a sublease “was against moral rules and good faith, was unethical, oppressive, and unscrupulous and ... offended public policy,” where two co-owners attested that the sublease “was not as economically beneficial” were insufficient to establish a LUTPA claim); Van Hoose v. Gravois, 11-0976, p. 9 (La.App. 1 Cir. 7/7/11), 70 So.3d 1017, 1023 (plaintiff, an insurance agency, which exclusively sold for one insurer, failed to establish a claim under LUTPA, where insurer essentially threatened to “shut down” the agency if policyholders transferred their policies and thereafter blocked all transfers of policies, as plaintiffs claims of conspiracy and injury to competition were “broad and conclu-sory” and failed to set forth a cause of action of an antitrust violation).
In the instant matter, the trial court issued no written reasons for judgment; however, the trial court found no genuine issues of material fact and concluded that Willis failed to establish a LUTPA claim, primarily based on three findings: (1) plaintiffs prospective business opportunity was not exclusive and did not preclude Brooks from purchasing the property directly from Stevens; (2) Brooks’ interest in the property predated plaintiffs involvement as evidenced by his July 10, 2008 call log; and (3) the verbal agreement between Stevens and Willis was not reduced to writing pursuant to La. C.C. art. 1839.[6]
1 ^Willis does not allege that defendants-appellees violated any statute, other than LUTPA, and cites no particular established public policy that defendants-appel-lees violated in their dealings with him. The crux of Willis’ case is that he apprised Autozone and Brooks of the existence of the property and that Autozone and Brooks “intentionally deceived and misrepresented ... their true intentions in order to secure an unfair advantage in the acquisition of Willis’ property development proposal.”
Having conducted a de novo review of the record, we find that the Brooks defendants and Autozone are entitled to summary judgment. As discussed more fully below, the record does not support the type of conduct on the part of either the Brooks defendants or Auto-Zone that falls within the “extremely narrow” range of prohibited practices under LUTPA. Rather, the record supports the trial court’s finding that the business opportunity proposed by Willis, as even Willis admitted, was not exclusive and did not preclude Autozone from purchasing *895 the property from Stevens. Simply put, Willis cannot establish facts giving rise to a LUTPA claim.
Turning to the evidence in the record, we first note that no one disputes that Willis and Stevens discussed Willis’ purchase of the property subject to his being able to locate a commercial tenant, although Stevens clearly testified that he would have sold the property “to anyone” willing to buy, as his verbal agreement was not exclusive. There is also no dispute that this was merely an informal agreement between the two or that Willis and Stevens never entered into a contract. There is equally no dispute that Willis never had any interest in or control of the property. When directly asked whether he had any interest in the property, other than a verbal agreement, Willis responded that he had none. Moreover, Willis 1 ^acknowledged that he had no exclusive right to the property, as reflected by the following exchange:
Q. Did you ask Mr. Stevens to keep the property off the market while you looked for a tenant?
A. No.
Q. Did Mr. Stevens tell you he would keep the property off the market while you looked for a tenant?
A. No.
Q. Did Mr. Stevens tell you he would not sell the property to anybody other than you?
A. No.
According to Carpenter’s deposition testimony, in June, 2008, Autozone began considering a return to the New Orleans East area and particularly, to the area where its store had been located prior to Hurricane Katrina on Chef Menteur Highway. In furtherance of that endeavor, Carpenter contacted Brooks in June, 2008 and asked Brooks to look for property at which an Autozone store could be developed. Carpenter came to Louisiana in June, 2008, at which time he and Brooks drove around that area “in an effort to identify property” suitable for an Autozone store.[7] The property that is the subject of this litigation “was one of many” properties they viewed at that time.[8]
Thereafter, on July 10, 2008, and according to Brooks’ cell phone records, Brooks placed a call to Stevens’ work place. While Stevens did not recall ever having spoken with Brooks, he confirmed that several others also answer the phone and could have answered the phone that day.
|! (According to his testimony, Carpenter returned to the New Orleans area in October, 2008. He came back in December, 2008, at which time he, Brooks and another Autozone employee Kendrick Hickman, “walked the property” at issue in this litigation and took pictures of it.
The record reflects that the next activity took place when Willis obtained a “Property Form” for a potential site for an Auto-Zone store from Autozone’s website, filled it out on behalf of Lynnco, Inc. (a company solely owned by Willis’ wife) and emailed it to Carpenter on January 13, 2009.[9] Thereafter, Willis spoke with Carpenter, who directed him to contact Brooks.
*896 Willis testified that, at either the end of January of the beginning of February, 2009, he met Brooks at the property. Willis admitted that, at this meeting, he told Brooks that “Stevens and [he] were friends and [he] had an agreement with [Stevens] to purchase the property.” Willis could not recall whether he told Brooks that this agreement was only a verbal agreement.
Willis then testified that Brooks advised that he would have a preliminary site plan drawn up. Brooks did not deny that he advised Willis that he would present the property to Autozone and if it was interested, “they could move forward if [Willis] had it under contract.” Again, Brooks reiterated that he “had talked to Autozone previously about the site.” According to Willis, however, “a couple of days” after he met with Brooks, or “[he didn’t know] how long” later, Carpenter told him that Auto-Zone was no longer interested in the property.
In the meantime, as reflected by the record, and consistent with Carpenter’s statement to Willis that Autozone was no longer interested in the property, | nAutozone was actively pursuing the reestablishment of a store at the location it occupied prior to Hurricane Katrina.[10] Both Carpenter and Carter Jacquet, the owner of the property where Autozone’s store had previously been located, testified that in January, 2009, they were discussing Autozone’s leasing Jacquet’s property.[11] As evidenced by a January 22, 2009 email, Carpenter received committee approval from Autozone to pursue Jacquet’s property. Carpenter then sent an email to Jac-quet dated February 2, 2009, asking for further information about Jacquet’s property so that they could “begin to negotiate a lease.” Lease negotiations for Jacquet’s property failed, although the date on which those negotiations ceased is unclear.[12]
The record is devoid of any documentary evidence of anything transpiring between that February 2, 2009 email from Carpenter to Jacquet and June, 2009, when Brooks contacted a local real estate agent, Joe Gorman, by email and asked that he look into Stevens’ property to “see if the property is still under contract” and, if so, “when the contract expires.”[13] Brooks advised that Autozone was “on [him] to get the property under contract.”
According to Brooks, in May, 2009, Carpenter contacted him again, advised that it was unable to negotiate a deal with Jac-quet and asked that he return to the Chef Menteur area and determine what was available. Brooks met with Gorman and they evaluated multiple sites, including Stevens’ property. Gorman then made an offer on Stevens’ property, and ultimately, Autozone purchased the property.[14]
*897 |1gBased on the foregoing, we find that Willis has failed to demonstrate the existence of material facts which would establish a violation of LUTPA. While Willis has made conclusory allegations of unfair and deceptive practices by the Brooks defendants and Autozone, those allegations are not supported by the record. The record demonstrates that Brooks and Au-tozone were aware of the property, having viewed it more than once before Willis submitted the property form to Autozone in January, 2009. Likewise, Willis did not deny that he told Brooks he had the property under contract and notably, he could not recall whether he advised that the “contract” he had was only a verbal, informal agreement.
Willis makes much of the fact that the offer to purchase the property was made by Avenue D, which did not disclose for whom the offer was being made, and suggests some nefarious purpose on Brooks’/Autozone’s part in this regard. We note, however, that Stevens testified that Willis, too, initially would not disclose who his potential commercial tenant would be. When asked if Willis identified his potential tenant, Stevens testified that “at that time [Willis] didn’t want to — another one didn’t want to tell me who his person was.”
Again, while Willis makes general allegations of unscrupulous conduct, the record does not reflect conduct on the part of the Brooks defendants and/or Autozone that rises to the level of a LUTPA violation. Rather, we find their conduct to fall within the range of “the exercise of permissible business judgment, or appropriate free enterprise transactions,” as referenced by the Cheramie court, rather than the “extremely narrow” range of practices prohibited by LUTPA.
| igFor these reasons, and those discussed above, the judgment of the trial court is affirmed.
AFFIRMED
BONIN, J., concurs with reasons.

. We refer to the three Autozone defendants (Autozone Stores, Inc., Autozone Development Corporation and Autozone, LLC), collectively, as "Autozone.” All three of the entities are alleged to be foreign companies licensed to do, and doing business in Louisiana.

.Carpenter is alleged to be a resident of Tennessee.

. While Willis’ Petition does not state the date of this discussion, in his deposition, he stated that he thought it was in early December, 2008.

. In his Answer, Brooks admits to being an employee of Avenue D.

. The Brooks defendants previously filed Peremptory Exceptions of No Cause of Action and No Right of Action, while Autozone/Car-penter filed a peremptory Exception of No Cause of Action or Alternative Motion for Summary Judgment. The Brooks defendants then adopted Autozone/Carpenter's exception/motion. By judgment dated January 18, 2012, the trial court denied the exceptions of no cause of action and deferred a ruling on the motion for summary judgment pending further discovery.

. These were the trial court’s reasons given at the hearing on the Brooks defendants’ Motion for Summary Judgment. Virtually identical reasons were articulated at the hearing on Autozone/Carpenter’s Motion for Summary Judgment as well.

. Carpenter confirmed that Autozone had a business relationship with Brooks since 2006.

. In fact, Brooks, on Autozone's behalf, entered into a contract for different piece of property in August, 2008, which was canceled in November, 2008, after Carpenter and another Autozone employee, Kendrick Hickman, had come to New Orleans and decided they would prefer a different location.

.The Property Form states that "[Autozone] accept[s] submittals from brokers only when the submitting broker has a written agreement with the owner of the property.”

. Autozone’s negotiations to return to its former location did not involve Brooks.

. The record contains only a few pages of Jacquet's deposition.

. There appears to be a dispute as to the reasons lease negotiations ceased; however, the reasons are inconsequential. The lease negotiations simply corroborate Carpenter’s and Brooks’ testimony that Autozone was actively pursuing its original site location, as they advised Willis.

. This email corroborates Brooks’ impression that Willis had the property under contract.

. Willis suggests some nefarious motive on Brooks’/Autozone’s part in making the initial offer to purchase on behalf of Avenue D, without disclosing that the ultimate purchaser would be Autozone. We note that Stevens testified Willis, too, initially would not disclose who his potential commercial tenant would be. When asked if Willis identified his potential tenant, Stevens testified that “at that time [Willis] didn't want to — another one didn’t want to tell me who his person was.”